These are actions, one by the plaintiff, W. O. Saunders, and the other by his wife, Columbia Saunders, against the defendant for trespass and assault. They were consolidated and tried together, resulting in a *Page 376 
verdict and judgment for the plaintiffs, from which the defendant appealed. As the parties differ materially as to the nature of the evidence, it becomes necessary to state it at some length, all of it having been introduced by the plaintiffs.
The plaintiff, Columbia Sanders, testified: "I live on Cypress Street, and have lived in this town since I was a child; am the daughter of John Ballance and wife of W. O. Saunders; have known the defendant twelve or thirteen years; was once a clerk in his store about three years, and for Mitchell, his brother-in-law, in which the defendant was a (466) clerk for about five years. On 31 July, 1910, I was at home alone in my house until about 9 P. M., and was on the porch when my husband came, a large crowd of people following him, from church; some in front and some behind him. My husband came in the gate and closed it; heard Gilbert's voice. He said to Mr. Saunders, `Will give you twenty-four hours to leave town.'"
Plaintiff was then asked, "What did the crowd do?" Defendant objected. Objection overruled, and defendant excepted. Answer: "The people leaned up against the fence and I heard other threats; my husband told them to leave, and the first man who came in the yard he would shoot. I was in the light and had on a white dress; saw a large crowd — two or three hundred people — and heard some one in the crowd say, `Get him now.' My husband fired upwards from the doorstep towards tree tops. I then pulled him on the porch and some firing began on the street. A bullet struck the wall; just did miss me. I saw the flash. Another bullet struck the piazza post immediately in front of me and between me and the person firing. If the bullet had not struck the post it would have hit me."
"What did any one say?"
"Just as Mr. Saunders got inside the gate, some one said, `That was all that saved you.'"
To this question and answer defendant objected; objection overruled, and defendant excepted.
"Two bullets struck the house and one struck the fence. The crowd seemed angry; saw no arms except flash of pistol. It made me nervous, and I was nearly wild; did not sleep that night; have not gotten over it yet; sent for Dr. McMullan, and he came."
Q. What did Dr. McMullan say he gave you? (Defendant objected; objection overruled; defendant excepted.) A. He said it was morphine.
Q. How did he administer it? A. He put it in my arm. It did not put me to sleep. There were several others who saw me, among them Mr. and Mrs. Simons and Mr. and Mrs. White. I was screaming and crying and could not eat or sleep any scarcely for about a week. I had a *Page 377 
baby about five months old and two other children, three and (467) five yeras [years] old, in the house with me. I am still afraid to sleep without doors and blinds closed. On Monday I sent for Dr. Fearing.
Cross-examined, she testified: "This was on Sunday night immediately after service. Some people always passed my house going from church, but no large crowd like this. Mr. Saunders' father was with him, and went in the yard when he did. No one else came in the yard. The gate was ten or fifteen feet from the porch. Mr. Saunders came to about the bottom of the step and fired two or three times; nobody else had fired before he shot. He fired twice. I don't know whether he fired the third shot then or a little after. Then the firing was from the street. I pulled Mr. Saunders in just after he had fired. I closed the door when he went in; don't know whether it was before the third shot or not. He went upstairs and left me on the piazza. Mr. Saunders had been to Blackwell Memorial Church. Nobody attempted to go into the the gate, but pushed against the fence in a threatening manner. Mr. Saunders had not been in the house, since he left to go to church, until after the firing began."
Edward Brinson testified: "I have lived in Elizabeth City seventeen years; know defendant. On 31 July, 1910, was at Blackwell Memorial Church; saw W. O. Saunders there; did not see Gilbert at church. I came out on side walk and saw it was full of people, and I got into the street in front of Saunders' house; heard some one say `Stop' or `Halt'; some one in the yard fired; it was Saunders who shot; held the pistol and fired up above the crowd. I saw Gilbert fire towards the house. I dodged around Gilbert and heard several shots from where Gilbert was standing near the oak. Gilbert kind of learned forward when he fired. I ran. I heard no threats. The street and the sidewalks were full of people, some walking leisurely, some fast, and some running."
J. M. Ballance testified: "I met O. F. Gilbert on the Street Monday, 25 July, 1910, a week before the occurrence, and had a talk with him. He said: `I understand you have stock in the Independent.' I said: `No, I have not; all I have done is to sign Saunders' bond (468) to keep him out of jail,' He said: I want to tell you that I want to withdraw from you, if you have any stock in it.' He said: `Why don't you help to stop this man (referring to Saunders) from talking about your pastor?' I said: `I have nothing to do with that.' I said something and he said, `Don't you think, if I am going to kill a man, it is my place to warn him beforehand of it?' Saunders was editor of theIndependent. On the 31st, at night, I was at Blackwell Memorial Church. I went towards home along Cypress Street. When I got about eighty feet of Saunders' home, some one fired two shots upward from Saunders' doorsteps; then there were four shots fired from the *Page 378 
street towards Saunders' house in quick succession from near the oak. I went home and then back to Saunders' home. Mrs. Saunders was very nervous. I stayed there that night with the chief of police and a guard. I am half-brother to Mrs. Saunders. I saw three bullet holes, but saw no bullets; saw the glancing dents in the wood. I was eighty feet away; no one between me and the party firing on the sidewalk. I heard Saunders say he fired three times before any one else shot. When Saunders drew his pistol the people on the sidewalk and on the street began to run. I am on Saunders' prosecution bond."
Mr. Matthews testified: "I live six or eight hundred feet from Saunders' house. Was in front of my gate and heard two shots and four to six more. I went to Saunders' house. The street was full of people in groups; considerable excitement; saw Mrs. Saunders. She was greatly distressed — on the porch wringing her hands and appealing for help."
Dr. Zenas Fearing testified: "I know plaintiffs. As mayor of Elizabeth City, I was phoned to come to Saunders' house Sunday night, and went as Mayor and not as physician. Mrs. Saunders was very nervous and on the verge of collapse. This was on Sunday night. Dr. McMullan was there Sunday night. She was nervous. On the 2d of August saw Mrs. Saunders professionally and treated her for nervuosness (469) [nervousness]." Charles Reid, sheriff of the county, testified: "Was at church and was going home; heard the shots — three shots, then four or five; went to the house of Saunders. Mrs. Saunders was nervous and asked me to protect her; stayed there until the crowd dispersed. I left guard around the house."
Plaintiff rests, and defendant introduced no evidence.
The court, after reading the evidence to the jury, stating the contention of the parties respectively, among other things, charged the jury as follows:
"1. If you find that Gilbert fired the shots towards the house through a reasonable apprehension that he was in danger of serious bodily harm from Saunders, or if he fired the shots believing that a felony was about to be committed, then Gilbert would not be guilty of committing a trespass as charged in the complaint, and it would be the duty of the jury to answer the issue as to trespass, `No.'" Defendant excepted.
"2. If you find that Gilbert fired the shots towards the house under a reasonable apprehension that he was about to suffer serious bodily harm himself or that a felony was about to be committed, then he would have had a right to so fire the shots, and he would not be guilty of assault or trespass, as charged in the complaint, and it would be the duty of the jury to answer the issue as to assault and trespess [trespass], `No.'" Defendant excepted. *Page 379 
"3. If you find that the plaintiff, W. O. Saunders, fired the shots in the air above the heads of the crowd for the purpose of protecting his home and frightening the crowd away and protecting himself from serious danger, and the said defendant fired the shots in the direction of the plaintiffs in a reckless manner without having any reasonable apprehension that he or anybody else was about to suffer from Saunders, then you should answer the issue as to unlawful assault, `Yes.'" Defendant excepted.
"4. If you shall find that the plaintiff, W. O. Saunders, fired the shots in the air above the heads of the crowd for the purpose of protecting his home and frightening the crowd away and protecting himself from serious danger, and defendant fired the shots in the (470) direction of the plaintiffs, in a reckless manner, without having any reasonable apprehension that he or anybody else was about to suffer from W. O. Saunders, then you should answer the issue as to unlawful trespass, `Yes.'" Defendant excepted.
Upon the subject of damages, the court charged the jury: "That if they should answer the issues as to the assaults and trespasses which appear in the record, `No,' they need go no further, for the plaintiffs would have suffered no damages. But if they answer those issues `Yes,' then they would go further and consider the question of damages and give to the plaintiffs such actual damages as they may have sustained because of the alleged wrongful conduct of the defendant Gilbert, and in reaching their conclusion as to such actual damage, they might consider any mental and physical pain which they find that the plaintiffs suffered by reason of the said alleged wrongful conduct on the part of the defendant, and in addition might add such amount as in their judgment and discretion they deemed right as punitive or exemplary damages, provided you find that there was an assault committed on plaintiffs, maliciously or wantonly." Defendant excepted.
After stating the case: The testimony as to what was said in the road and in front of the plaintiff's home was clearly competent. The res gestoe
includes what was said as well as what was done. The acts and outcries of this unlawful assembly — for that is, in plain speech and in law, what it was — is held to be competent as pars rei gestoe, and also as tending to show their purpose or quo animo. Nothing is better settled than this rule of evidence. S. v. Rawls, 65 N.C. 334; *Page 380 S. v. Worthington, 64 N.C. 594. We find it stated in 4 Elliott on Evidence, sec. 3128, that "What is said and done by persons during (471) the time they are engaged in a riot (or unlawful assembly) constitutes the res gestoe, and it is, of course, competent, as a rule, to prove all that is said and done" — the acts and words of the mob or any members of it, as in Rex v. Gordon, 21 State Trials, 485 (563), wherein evidence of the cries of the mob "No Popery," as it was proceeding towards Parliament House, were held competent and admissible as a part of the res gestoe.
What Dr. McMullan said to the feme plaintiff, Mrs. Saunders, when he was administering morphine hypodermically, is not of sufficient importance to warrant the granting of a new trial, if it was incompetent as evidence. Proof of her highly excited and nervous condition was overwhelmingly established by the testimony, and there was none to the contrary. We are permitted to use our common sense sometimes in deciding legal questions, and every one must know that the good doctor was administering something medicinally for the alleviation of her sufferings and to quiet her excited nerves. Whether it was morphine, or any other opiate, narcotic, anodyne, or sedative, can make no essential difference. It was evidently given, whether internally or by hypodermic, to calm and soothe her disturbed feelings. We do not mean to imply that it was not competent as a statement accompanying an act and explanatory of it, but waiving, for the present, the question of its admissibility under the strict rule of evidence, it was harmless, if incompetent.
Having passed the skirmish line, we will now address ourselves to the remaining point in the case, the validity of the judge's charge upon the subject of forcible trespass and the right of self-defense. The charge was clear and sufficiently full, in the absence of requests for more specific instructions. If the defendant thought himself entitled to an instruction that "A person exercising the right of self-defense may safely act upon appearances, or the facts and circumstances as they appeared to him at the time, if he entertained an honest belief in their existence," he should have asked the judge to make his charge more definite in that respect; and having failed to do so, he cannot, after the verdict, complain. Simmons v. Davenport, 140 N.C. 407. He (472) appeared, by his silence, to be content with the instructions, and we will not hear him speak now. The judge laid down a correct rule, that the defendant must have had a reasonable apprehension that his own life or limb was in jeopardy, and the jury are to judge of the reasonableness of his fear, notwithstanding the other principle asserted.S. v. Nash, 88 N.C. 618. Would a man of ordinary firmness and similarly situated have reasonably acted upon the assumption that *Page 381 
he was about to receive serious bodily harm, and defended himself, giving him the benefit of his view of the circumstances at the time? InNash's case, Judge Ashe said: "The Court did not give the prisoner, in Scott's case (4 Ired., 409), the benefit of the principle, for the reason that no such instruction had been asked in the court below, the judge concluding that the prisoner would have requested the instruction if he had acted upon such belief." This is a sufficient answer to defendant's exception for failure to give the instruction, the omission of which in the charge is now assigned as error. A defendant must not sleep upon his rights, but he vigilant; otherwise, the court may be betrayed into assuming that he had none, because he did not assert them. But on other grounds, should the failure to insert the instruction in the charge, even if it is correct in itself, be reversible error? We think not. The defendant's liability for a trespass or an assault depended, not upon his right of self-defense. He was the aggressor and, with his associates, had pursued the plaintiff, W. O. Saunders, even into his own yard — it may, with strict regard for the facts, be said, had forced him there by his fear of superior numbers, until he took refuge in his own house and escaped from threatened violence to his person. The offense of forcible trespass or assault was complete at that very moment, and what occurred afterwards — when, in the apprehension that he was about to be attacked on his own premises, Saunders fired his pistol "to scare them off," and defendant returned the fire — has nothing to do with the unlawfulness of the defendant's acts, and does not excuse what they did. He had already committed a forcible trespass and assault, as we will see, and Saunders' conduct, defensible, in law, as it (473) is (S. v. Nash, supra), did not excuse him or condone the offense he had already committed. Who will say that Saunders did not have reasonable ground to apprehend that they were about to attack him, and even his wife, whom he had the right to defend, in his own house?
It would seem unnecessary to discuss the character of the defendant's acts in order to show that they were unlawful and violative of the plaintiff's rights of person and property. They were, at least, sufficient to constitute a civil trespass. "If three persons commit a trespass upon property, in the presence of the person in possession, their number makes it indictable, although actual force is not used." S. v. Simpson,12 N.C. 504. In that case the learned and just judge who presided over this Court at the time (Chief Justice Taylor) said: "The inquiry therefore is, whether the facts proved, according to the case sent up, amount to an indictable trespass. In Regina v. Soley it is said by Lord Holt
that `As to what act will make a riot or trespass, such act as will make a trespass will also make a riot'; by which he must be understood to mean, if committed by three or more persons. 11 Mod., 116. The converse *Page 382 
of the proposition must be true, that a trespass committed by three or more persons will make a riot. In every trespass, as well as riot, there must be some circumstances, either of an actual force or violence, or at least of an apparent tendency thereto, as are apt to strike a terror into the people; but it is not necessary that personal violence should have been committed. Clifford v. Brandon, 2 Campbell, 369. Any resistance on the part of the prosecutrix must have led to an actual breach of the peace; but the resistance of two women to the four persons who came to take the corn must have been unavailing." So in S. v. Rawls, 65 N.C. 334, it was held that when even four persons, with a gun and hoe, pursue another who is at a place where he has a right to be, and by threatening and insulting language put him in fear or by what is calculated to do so, and thereby induce him to go home sooner that he would have gone, or in a different way or course, and compel him by their numbers to do what he would not otherwise have done, they were guilty of a forcible trespass, although they did not approach nearer to him than seventy-five yards, and did not attempt to use their weapons. It is further said: "When a number of (474) persons meet together, and there is evidence tending to show a common design to commit an assault upon another, they may all be properly found guilty, though only one of them used threatening and insulting language to him." And again, said Judge Settle: "The prosecutor was where he had a right to be, and had just been engaged in repairing his fences, which some one had knocked down, and no one had the right by numbers, manner, language, weapons, or otherwise to drive him home by a different path or at a different pace than that which he chose to take. What was the prosecutor to do? Was he to stand still and submit to a battery? Can the defendants stand in a more favorable light before a court of justice merely because their violence was not fully consummated in consequence of the flight of the prosecutor? Some stress seems to be laid upon the fact that the gun and other weapons were not taken from the shoulders of those carrying them. As is said in S. v. Church, 63 N.C. 16, that makes no difference, for `that would have been but the work of a moment, and was not needed to put the prosecutor in fear and to interfere with his personal liberty.'" But the subject was fully discussed in S. v. Davenport, post, 596, and the authorities cited, and it covers the questions now raised by the defendant. There can be no question that defendant is civilly liable for the trespass and assault.
It can make no difference that this large multitude of people did not actually enter upon the premises of the plaintiffs or go within their curtilage. We have held that the gathering of a large number of persons on the public road in front of a man's house, or the use of violent, *Page 383 
abusive, or insulting language in a public or private road, or in the street of a city, in the presence and hearing of the owner of adjoining property, constitutes a forcible trespass. S. v. Lloyd, 85 N.C. 573;S. v. Hinson, 83 N.C. 640. In S. v. Widenhouse, 71 N.C. 279, (475) it is said that "The only privilege which the public have in a public road is that of passing over it, and those who abuse that privilege become trespassers ab initio," citing S. v. Buckner, 61 N.C. 558, whereJudge Reade says: "All misbehavior is aggravated by being in a publice [public] place. The only privilege which the public have in a public road is that of passing over it. If they misbehave in it, they create a nuisance. The road is for travel and for no other purpose." Judge Ashe
said, in S. v. Davis, 80 N.C. 351: "He (the defendant) seemed to have rested his defense upon the ground that he was in the public road and had the right to do there as he pleased. In this he was mistaken. The public have only an easement in a highway — that is, the right of passing and repassing along it. The soil remains in the owner, and where one stops in the road and conducts himself as the defendant is charged to have done, he becomes a trespasser, and the owner has the right to abate the nuisance which he is creating. The principle ofmolliter manus does not apply to a case like this, where the trespasser, armed with a pistol, is acting in such belligerent defiance. See S. v.Buckner, 61 N.C. 558. The defendant used language which was calculated and intended to bring on a fight, and a fight ensued. He is guilty. S. v. Perry, 50 N.C. 9; S. v. Robbins, 78 N.C. 431."
In our case it was a pistol duel which ensued from the defendant's aggressive conduct, and the multitude with him supplied the place of the required force or violence, as it certainly tended to intimidate the plaintiffs and to put them in fear. S. v. Laney, 87 N.C. 535. It is, therefore, because the acts were committed in a public place and were just as much calculated to produce a breach of the peace as if actual entry had been made upon the premises, which could be done in a moment, that we cannot escape the conviction that this invasion of the defendant and his conspirators was conducted in such numbers and with such a display of force as to overawe and intimidate the plaintiffs, and it surely tended to a breach of the peace. He is contending that it did actually lead to that result, as he is charging the plaintiff W. O. Saunders with assaulting him and putting him on the defensive, so that he returned his fire, and we have an alleged duel; yet (476) nobody is guilty — and surely not the aggressors!
The cases collected in Walser's Index-Digest of the Criminal Law, at pages 162-166, will be found, when examined, to fully sustain our view of the facts of this case, when considered in their legal aspect. "A person who merely stops on the sidewalk in front of a man's house and *Page 384 
remains there, using abusive and insulting language towards him, commits a (civil) trespass." 28 A. E. Enc., 553, citing Adams v. Rivers, 11 Barb. (N. Y.), 3901.
It is argued, and with some plausibility, that the court erred in allowing the jury to award punitive damages, in addition to those which are actual and compensatory. It would be exceedingly strange if a civil injury, which is also a crime, does not entitle the injured party to vindictive damages, and yet it is said that the reason why the law should be so is the very fact that the defendant will be punished in the criminal indictment, if convicted. But he may not be either indicted or adequately punished. Whatever may be the law elsewhere, this Court has held, according to the rule, which we think is general, that when the defendant has been indicted and punished for the crime, the pecuniary punishment can be considered by the jury in reduction of punitive damages.Johnston v. Crawford, 61 N.C. 342. Is not this the fair and equitable rule? Should the wrongdoer escape his full and proper measure of punishment in the civil suit until he is ready to show that he has made proper amends to the public in the criminal prosecution? Even then the payment of the fine may be considered only in reduction of the damages, as we have shown, and does not bar the claim to vindictive damages. In Sowers v. Sowers, 87 N.C. 303, Chief Justice Smith
says: "Even after conviction and punishment by fine under an indictment for an assault, it would not defeat the right of the injured party to recover exemplary damages, or, as it is sometimes called, `smart money,' and could only be made available in reduction of damages," citing Smithwick v. Ward, 52 N.C. 64, and approving the law thus stated by Judge Manly: "This element, in the estimate of (477) damages, is allowed, to punish the defendants for violating the laws, and by making them smart, to deter others as well as themselves from similar violations. The principle upon which society acts in punishing criminally is precisely the same. The public never is actuated by revenge, but solely by a motive of self-protection, and punishes to prevent a repetition of the offense by the culprit, or its perpetration by others." It is not, and should not be, his liability to be criminally indicted and punished for the same offense that entitles him to any reduction, but his actual prosecution and punishment for the same. Sedgwick, one of our most accurate writers upon this subject, has given this rule to guide us: "Thus far we have been speaking of the great class of cases where no question of fraud, malice, gross negligence, or oppression intervenes. Where either of these elements mingle in the controversy, the law, instead of adhering to the system, or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages; in *Page 385 
other words, blends together the interest of society and of the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender." 1 Sedgwick on Damages, p. 53; 13 Cyc., 106.
We had occasion to consider this question in Jackson v. Telephone Co.,139 N.C. 347, and in that case, after a review of the precedents, we arrived at this conclusion: "The doctrine is well settled that the jury, in addition to compensatory damages, may award exemplary, punitive, or vindictive damages, sometimes called `smart money,' if the defendant has acted wantonly or with criminal indifference to civil obligations (R. R. v.Prentiss, 147 U.S. 106), or (the defendant) has been guilty of an intentional and willful violation of the plaintiff's rights. R. R. v. Arms,91 U.S. 489; Hansley v. R. R., 117 N.C. 565."
Barry v. Edmunds, 116 U.S. 550, sustains the doctrine in the following words: "It is settled in this Court that in an action for trespass, accompanied with malice, the plaintiff may recover exemplary damages in excess of the amount of his injuries, if the ad damnum is properly laid." See, also, Williams v. R. R., 144 N.C. 498. Even under the rule as stated in Remington v. Kirby, 120 N.C. 320, the plaintiff was entitled to punitive damages. It is the willful (478) disregard of the rights of another, treating him with contempt or insult, or willfully or wantonly trespassing upon his lawful rights, that requires rebuke and makes the necessity for vindicatory justice; sets an example to wrongdoers and appeases an offended society, whose members should be permitted to live in peace and without molestation, and not be subjected to disturbance in their Sunday devotions or in their quiet and peaceful homes, by an unlawful invasion by those who, strangely enough, imagine that they can resent alleged grievances by themselves becoming the violators of the law.
This is an aggravated case, and the verdict was none too large. A citizen returning from church on a Sabbath evening is accosted on the street by the defendant and his associates and offensive epithets applied to him, and he is pressed upon so hard that he is compelled to seek protection and safety in the recesses of his home; and still the defendant contends that these acts are but a simple violation of the plaintiff's rights, without any features of aggravation, when it appears that he fired into the house and narrowly missed killing or severely injuring plaintiff's wife — a defenseless woman, whom he should have seen, as she was standing under the light. This case is the equal of any in our law books for its flagrancy, whatever the provocation may have been, and calls, if any state of facts can call, for the award of punitive damages. *Page 386 
 Chief Baron Pollock (of the Exchequer Chamber) said that vindictive damages were generally awarded in actions of trespass, if accompanied with circumstances of insult or humiliation, or if the wrong is willfully committed in reckless or contemptuous disregard of the plaintiff's rights. In such a case, he thought — and his associates, Barons Bramwell, Wilde
and Channel, agreed with him — the jury should be free to assess damages beyond those which are awarded in the ordinary case, where the wrong is unattended by any such circumstances, and he added that the courts have always recognized the distinction between damages given (479) with a liberal and a sparing hand. Embleu v. Myers, 6 Harlst and Norman, 54; Day v. Woodworth, 13 How (U.S.), 363, 371;McNamara v. King, 7 Ill. 432. If a wrong is willful, compensatory damages are not adequate, but the defendant must pay an additional sum for the sake of society and to discourage a repetion [repetition] of his offense against its laws.
In a case where the circumstances of the assault were much less aggravated than those appearing in the record, Chief Justice Gibbs said: "I wish to know, in a case where a man disregards every principle which actuates the conduct of good citizens, what is to restrain him except large damages? To be sure, one can hardly conceive worse conduct than this. What would be said to a person in a low station of life who should behave himself in this manner? I do not know upon what principle we can grant a rule (for a new trial) in this case, unless we were to lay it down that the jury are not justified in giving more than the absolute pecuniary damages that the plaintiff may sustain."
The subject of punitive damages has been considered at this term in a learned opinion by Justice Hoke, delivered in Blow v. Joyner, ante, 140, a case much like this in some of its features.
But the defendant's counsel contended that there were no actual damages, and, at most, the plaintiffs could recover only nominal damages; and this being so, it follows that no exemplary damages can be awarded. We do not assent to the premises or the conclusion. In answer to a similar contention, we find the following in 1 Sedgwick on Damages (8 Ed.), sec. 361: "If the plaintiff has suffered no actual loss, he cannot maintain an action merely to recover exemplary damages. A plaintiff has no right, the courts say, to maintain an action merely to inflict punishment; exemplary damages are in no case a right of the plaintiff, and cannot, therefore, become a cause of action. If, however, a right of action exists, though the loss is nominal, exemplary damages may be recovered in a proper case; for the plaintiff had a right to maintain his action apart from the privilege of recovering exemplary damages. So in case of a malicious trespass on land, though the actual damage is nominal, exemplary damages may be recovered." Wilson v. Vaughan *Page 387 
23 Fed., 229; Hefley v. Baker, 19 Kansas, 9. The same rule (480) was applied by Chief Justice Wilmot in Tullidge v. Wade, 3 Wis. 18. It is erroneous, though, to assume that there was no actual damage done by the defendant which gave the plaintiff a right to substantial compensation. He deliberately shot into the house, frightened and alarmed the plaintiffs, who were rightfully and peacefully its occupants. These and some other acts are properly subjects of fair compensation, and not merely of nominal damages. In Rogers v. Spence, 13 M. W., 571, Chief Justice Denman said: "The actions of trespass on real and personal property were an extension of that protection which the law throws around the person, and substantial damages may be recovered in respect of such rights, though no loss or diminution in value of property may have occurred."
It is held to be the law that an individual whose rights of person or property are thus violated is generally entitled to recover damages for pecuniary loss, physical pain if any, inconvenience, injury to feelings, and mental suffering, pain, vexation, anxiety, the sense of wrong, shame or humiliation in the sufferer's breast, resulting from an act dictated by a spirit of willful injustice, or by a deliberate intention to vex, degrade, or insult, the latter being sometimes called solatium — solace or recompense for the wounded feelings, as distinguished from special or pecuniary damages. 1 Sedgwick (8 Ed.), sec. 37 et seq. Inconvenience, annoyance, or discomfort may also be considered. This, of course, is physical, and must not be purely imaginative, and must be produced through the medium of the senses, not flow from mere delicacy of taste or refined fancy or abnormal sensibility. It must be in a tangible form and assessable at a money value. 1 Sedgwick, sec. 42, and cases cited; Williams v. R. R.,supra; 4 Sutherland on Damages, secs. 1010a and 1241.
"The motive with which a wrong is done in some cases affects the rule by which compensation is measured or losses estimated. Where there is fraud or other intentional wrong, compensatory damages are given with a more liberal hand by juries and their verdicts in such cases are less closely scanned by courts than in cases where that element is absent. . . . But there is a more liberal allowance of damages (481) where the tort is an aggressive one, and the entire damages or some part of them are not capable of measurement by some standard of value or definite rule."
We again remind those who are disposed to take the law into their own hands and punish their enemies or a supposed wrongdoer, that there is a sufficient legal remedy for every alleged grievance, and if they will not resort to the courts where it can be enforced, but prefer to act in *Page 388 
defiance of constituted authority, the fault and the consequences will all be theirs, and they have no reason to complain if that same offended law, whose peaceful methods they have ignored, rebukes their defiance with heavy damages.
It is suggested in the evidence that W. O. Saunders had committed some gross impropriety by criticising a minister of the gospel in his newspaper. The specific offense is not pointed out, nor are we in any way informed as to the nature of his criticism. But this is all immaterial. Perhaps he may have greatly exceeded the limits of fair and proper comment, and that which he did should be reprobated. We cannot say how this is, nor need we, as the matter is not before us. There is one thing very certain, though: the defendant, and the multitude he was leading, had no right to resent what he had said by approaching him and his home in a hostile manner, with threats and menaces, and with a deadly weapon, to execute revenge upon him, however grievous his offense against them or against society, and not even if it was a criminal libel he had published. Government could not upon any other principle, exist or continue as it was designed to be, when organized for the peace, safety, welfare, and happiness of the people. If the plaintiff, W. O. Saunders, has committed any wrong, if he has willfully criticised a minister or committed any other offense against public decency or social order, we have not the slightest word to utter in extenuation of the outrage; but he should be punished by the law and not by the mob.
No error.
Cited: May v. Tel Co., 157 N.C. 423; Webb v. Tel. Co., 167 N.C. 489;Trogdon v. Terry, 172 N.C. 542.
(482)