## FRANK GUYER v. JAMES SMULLEN AND OTHERS.[1]

June 27, 1924.

No. 24,003.

**Question for jury whether plaintiff was liable for act of his bartender.**
1. Under the circumstances of this case, it was a question for the jury whether, if plaintiff's bartender assaulted defendant as the latter claimed, it was an act of a servant in the course of his employment and in furtherance of his master's business, so that plaintiff would be liable.

**Change of venue.**
2. No error found in denial of a motion for a change of venue for the purpose of procuring an impartial trial, the same having been denied on conflicting affidavits.

**Defendant cannot plead self-defense.**
3. A defendant who, with a number of companions, wrongfully invades plaintiff's premises, and in doing so assaults the latter and makes no attempt whatever to desist or withdraw from the fray until it is ended by plaintiff's resistance and the interference of others, cannot, on the ground of self-defense, justify the injury to plaintiff resulting from the fray.

Action in the district court for Le Sueur county to recover $10,000. The answer of defendant Smullen alleged a prior assault by plaintiff upon defendant and self defense by the latter, and set up a counterclaim for $10,000 for an assault by plaintiff's employe. Plaintiff's motion for change of venue to the county of Waseca or

[1]Reported in 199 N. W. 465.

some other adjoining county was denied.   The third trial of the
case was before Tifft, J., who at the close. of the testimony denied
plaintiff's motion for a directed verdict in his favor and for a
directed verdict in his favor on defendant's counterclaim, and a jury
which returned a verdict in favor of defendant.   From an order
denying his motion for a new trial, plaintiff appealed.   Reversed.

*Henry M. Gallagher* and *Moonan & Moonan*, for appellant.

*Thomas Hessian*, for respondent.

STONE, J.

This is an appeal by plaintiff from an order denying him a new
trial after a verdict for defendant Smullen in an action for damages
for assault and battery.   Defendants Peterson and Perkins did not
appear by answer or otherwise and are not parties to this appeal.

The action grew out of the celebration at Waterville, in Le Sueur
county, of the premature and spurious "armistice" of November
7, 1918.   There have been three trials, the first two resulting in
disagreements.

Plaintiff was the owner and in active charge of one of the
several saloons in Waterville.   Another went by the somewhat
ironical name of "The Health Office;" still another was owned by
one Kim.

Early in the afternoon in question, defendant (the respondent
will be so referred to), came into town from a nearby lake where
he was conducting a commercial fishing operation.   He is a young
man of 57 years, is apparently of vigorous strength and weighs
about 225 pounds.   Upon arriving in Waterville, he repaired to
"The Health Office" where with convivial friends he spent about
an hour and consumed at least "4 or 5 beers."

Leaving "The Health Office," defendant with a number of com-
panions including his codefendants, Peterson and Perkins, repaired
to the Kim saloon.   There was a crowd.   As defendant put it:
"There was a lot ahead of us."   Conditions were such that, appar-
ently out of a desire to protect their own property, the saloon-
keepers were not anxious to do more business that day.   When

defendant and his companions arrived at Kim's, they found it closed and did not go in.

The crowd then went to plaintiff's place and found the door closed and locked. Defendant (following now his own testimony), "came to the door on the outside." Plaintiff "came to the door from the inside." Defendant "had plenty of chance to get away." He had been "banging around," but not for long. Defendant "tried the door." He did not go away because he wanted to get in. He *"knew* he was perfectly sober."

Somebody in the crowd at this juncture applied to plaintiff a somewhat stereotyped but vile epithet qualified by the adjective "pro-German." Defendant's testimony with respect to the user of that epithet is peculiar. He was asked if he was the person who applied the opprobrious characterization to plaintiff. His testimony then proceeds in part as follows: "A. I don't think I did, but it was used * * * I might have. I testified to that (on the former trial). Q. And now you change your testimony? A. I might just as well change it because it's me, it's Smullen that is fighting this case, * * * Might just as well tell it that way * * * I testified in the first case I did say that, and I testified in the second case that somebody made that remark and it might' just as well be me as the man that made it. Q. What are you going to testify to in the third case? A. Either way. * * * Probably it was me, might just as well be me, might just as well put it that way. * * * I testified on the first trial I did and the next one I said it was me, just the way I am testifying now * * * Either way may be the truth. Somebody made the re-mark."

The demonstration by Smullen and his companions continuing in front of plaintiff's door, it was opened. Defendant testified as follows: "He (plaintiff) opened the door. I thought he wanted us to come in and I stepped up there and he pushed me and he got his finger in my eyes and his thumb in my mouth." At a previous trial defendant's testimony was in part as follows: "Q. Well, what do you think he was trying to do there? A. Why, he had his place locked up. Q. Yes, he was trying to keep you out? A. I suppose."

There ensued a scuffle. It was inside plaintiff's saloon. Before the row was entirely over, defendant had further trouble with plaintiff's barkeeper, one Bowman. The evidence leaves the initiator of that trouble as well as the exact time of its occurrence in doubt. Defendant's testimony is that he and plaintiff had no sooner separated in a seeming armistice of their own, than defendant was set upon by Bowman in an independent assault, wherein defendant got very much the worst of it. The testimony for plaintiff, on the other hand, indicates that defendant, not satisfied with his first invasion of the saloon, came back a bit later looking for more trouble and was simply accommodated by Bowman.

Plaintiff's cause of action is predicated upon the assault made upon him by defendant when the latter and his companions first came. Plaintiff's thumb was lacerated, "chewed" by defendant. Amputation followed—whether from the wound or the treatment is doubtful. For his part in the doings of the afternoon, plaintiff was arrested for disorderly conduct, pleaded guilty, and paid a fine of $20. The defense was that whatever force was used by defendant fell within the limits of proper self defense. Going beyond that, defendant counterclaims for damages from the alleged assault made upon him by Bowman, plaintiff's employe.

1. The first assignment of error for consideration is that defendant's counterclaim was improperly submitted to the jury. We do not take that view. Defendant's testimony makes it a question of fact whether this row was not brought on by a wholly unjustified aggression of Bowman after defendant's trouble with plaintiff was over. It was in the saloon. Bowman was there as barkeeper. If, as defendant claims, after plaintiff and defendant had separated, their altercation at an end, Bowman made an independent and unprovoked assault upon defendant, it would be for the jury to say, under the circumstances, whether it was an act of the employe for which the employer is liable. Cressy v. Republic Creosoting Co. 108 Minn. 349, 122 N. W. 484.

Defendant's testimony was such that, if believed, it might lead to the conclusion that Bowman's conduct was in the course of his employment and furtherance of his master's business. It cannot

be said, as a matter of law, that an assault by a bartender in the situation claimed by defendant, is an act of the servant for which the master, the owner of the saloon (who, by the way, must have been standing by at the time), is not liable. The assault involved in Johanson v. Pioneer Fuel Co. 72 Minn. 405, 75 N. W. 719, was considered not to pertain to the duties which the servant was employed to perform. Here, defendant's story of his trouble with Bowman does not warrant the same conclusion as a matter of law.

The evidence is strong against defendant with respect to the Bowman incident. The testimony of the witness Spooner, a disinterested person, is especially convincing. But, upon the whole case, the counterclaim presented a question which was properly submitted to the jury.

2. The next assignment of error is predicated upon the refusal of the trial court to grant a change of venue. The motion was put upon the ground of the asserted impossibility of plaintiff's procuring a fair trial in Le Sueur county because of the political influence of defendant, charges against plaintiff of pro-Germanism during the World War, and the publicity the whole affair had received. The learned trial judge knew the situation, or, in any event, was in a much better position than we are to weigh the affidavits, which were in conflict. We cannot say that his conclusion was wrong.

3. The real issue in the case is whether the evidence for defendant justified submission to the jury of his claim of self-defense. We conclude that it did not, and that there must be a new trial— a result we regret—for this is one kind of litigation which it is especially desirable to terminate as speedily as possible.

The learned trial judge assumed that the evidence presented the possibility that, in some way we fail to understand, the jury might properly find that plaintiff, rather than defendant, committed the assault. Therefore, his charge permitted the exoneration of defendant under the "comparative force" rule. We think that course wrong for reasons the statement of which will now be attempted.

All through, defendant's testimony is hopelessly equivocal. To the jury belonged the task of saying what parts of it were true. But, giving it the most favorable aspect permitted by judicial consideration, it yet leads to the conclusion that defendant was the aggressor and brought on the collision with plaintiff by his own unlawful action, and had made no attempt to withdraw from plaintiff's premises or the fray until after plaintiff was injured.

Defendant was not alone. He was accompanied by a number of friends, obviously engaged in a mission of belligerance against plaintiff. It was a "forcible trespass" against plaintiff. Saunders v. Gilbert, 156 N. C. 463, 72 S. E. 610, 38 L. R. A. (N. S.) 404. It was a riot and, as such, a crime. Sections 8793, 8794, G. S. 1913. They were "banging around." They tried plaintiff's door and found it locked but did not turn away and leave plaintiff unmolested as they should have done. Violence was threatened by word and act.

There is testimony that an effort was made to break in the door, but defendant did not admit that. Plaintiff, however, was not obliged to wait invasion. He had the right, if he chose, to prevent the smashing of his door by opening it, and meeting the invaders with a counter offensive. Defendant tried to enter where he knew he was not wanted. If plaintiff did all that defendant claims, that is, attempt to push him back and out, even though the pushing was done on defendant's face with force, plaintiff was within his right, and defendant cannot invoke the protection of self-defense. The evidence, other than the testimony of defendant alone, is that, when plaintiff's thumb invaded defendant's mouth, the two were down, defendant probably on top. Moreover, one of defendant's willing assistants, so it is persuasively stated by other witnesses, was kicking plaintiff—kicking him while he was down in a grapple with his 225-pound adversary.

Even in a trial for homicide, it is not permissible to ignore "the circumstances of provocation" on the part of the aggressor. State v. Scott, 41 Minn. 364 (373), 43 N. W. 62. The charge here wholly ignored them. Plaintiff was under no duty to "retreat to the wall" or at all. It was his privilege to defend himself and his property

and to do it in any reasonable manner. It was defendant's duty to retreat, but the jury was not so instructed.

The affray did not take place where the parties had equal rights. Compare Mailand v. Mailand, 83 Minn. 453, 86 N. W. 445. Plaintiff was on his own premises where he had a right to be. Defendant was attempting to go where he had no right to go. He was accompanied by companions in such numbers that their very presence, under the circumstances, was a formidable threat of impending attack. One witness said that, while the crowd was pushing on the door, with plaintiff just inside, one of them told him to open the door or he would "kick it in" and that when the door opened "they piled right in on him. Mr. Smullen was one of the first ones." That he was the very first to enter is apparent from defendant's own story. He was leading the attack.

Plaintiff had a clear right to assume danger from the presence and manner alone of defendant and his crowd.

"It can make no difference that this large multitude of people did not actually enter upon the premises of the plaintiffs, or go within their curtilage. We have held that the gathering of a large number of persons on the public road in front of a man's house, or the use of violent, abusive, or insulting language in a public or private road, or in the street of a city, in the presence and hearing of the owner of adjoining property, constitutes a forcible trespass." Saunders v. Gilbert, 156 N. C. 463, 72 S. E. 618, 38 L. R. A. (N. S.) 404, 409.

Plaintiff claims, and his testimony is corroborated, that they were making progress in kicking the door in before he opened it. Anyway, it is not denied that the actual clash between plaintiff and defendant occurred *in the saloon and not on the street*. According to plaintiff; he was attacked at once by all three defendants; they had him down "and as I fell, Mr. Smullen got on top of me and in the scuffle I got my thumb in his mouth and he shut down on me while the other two were pounding me and kicking me."

But we must return to defendant's testimony. We are governed by it. With all favorable implications, it still shows defendant an

aggressor. That is not all. It shows that he made no effort to retreat or desist from his riotous invasion of plaintiff's premises and from what in any view of the case was an assault on plaintiff.

Defendant having been the aggressor, committing unlawful acts of riot, trespass and assault, and not having made any effort to withdraw from the accomplishment of his unlawful purpose, he is in no position to plead self-defense, 2 R. C. L. 551, 5 C. J. 636; Renfro v. Barlow, 131 Ky. 312, 115 S. W. 225; Morris v. McClellan, 169 Ala. 90, 53 South. 155; Smith v. Fahey, 63 W. Va. 346, 60 S. E. 250; Massett v. Keff, 116 La. 1107, 41 South. 330; Vaughan v. McDaniel, 89 Ark. 462, 117 S. W. 533. The case is somewhat akin to Drysdale v. State, 83 Ga. 744, 10 S. E. 358, 6 L. R. A. 424, 20 Am. St. 340, where it was held that an adulterer, when nearly caught in the act by the wronged husband, had no right to defend himself from the latter's attack by using a deadly weapon.

One so clearly the perpetrator of criminality as defendant cannot so easily put in the same category of wrongdoing him who attempts *lawfully* to frustrate the crime. "Thus, to a certain extent, a man puts aside the protection of the law when he makes an assault upon another, for the other may lawfully inflict injury upon him in necessary self-defense." Cooley, Torts (3d ed.) 54.

By statute, a person may lawfully use all the force necessary "to prevent an offense against his person, or a trespass or other unlawful interference" with his real or personal property. Section 8634, G. S. 1913. Here, the force used by plaintiff was clearly insufficient to prevent either the assault or the trespass. As to that, the record leaves no question. There was no moment when defendant's aggression ceased and he became in turn the victim of a counter assault. His battery was ended only by plaintiff's resistance and the interference of others. That is all there is to the case and it does not admit of the plea of self-defense by defendant. The situation is not altered by the fact that during the fray, while defendant was still the aggressor, plaintiff's thumb got into his mouth. He cannot so justify the resulting mutilation of plaintiff. It was the direct and immediate result of his own wrong and did not follow from any excessive force used by plaintiff.

If there is another trial, it will not be amiss, in order properly to understand the result, to have the jury make separate findings on plaintiff's case and that presented by counterclaim.

Order reversed.