## STATE v. JOHN WINKELS AND OTHERS.[1]

February 10, 1939.

No. 31,925.

[1]Reported in 283 N. W. 763.

*C. J. Laurisch* and *Josiah A. Baker,* for appellant.

*William S. Ervin,* Attorney General, *Roy C. Frank,* Assistant Attorney General, and *A. C. Richardson,* County Attorney, for the State.

GALLAGHER, CHIEF JUSTICE.

In an information filed by the county attorney of Mower county, defendant and three others were charged with the crime of "riot" as defined by 2 Mason Minn. St. 1927, § 10280. Tried separately, defendant was convicted and appeals from an order denying his motion for a new trial.

At the time involved Montgomery Ward & Company operated a retail store in Austin. A local union was endeavoring to unionize its employes. On Saturday, April 9, 1938, a large number of people assembled around the store, and several of them entered. Some damage was done. As a result, the store was closed about four o'clock in the afternoon. The crowd then dispersed. The following Monday forenoon the store was picketed by 10 or 15 pickets. It did

business as usual during the forenoon. About one o'clock a crowd began to assemble in front of the store, and by two o'clock it had reached sizable proportions. The sheriff and a number of police officers came to the scene and stationed themselves in the building in an effort to prevent a recurrence of the incidents of the previous Saturday. About two o'clock some 40 or 50 men, over the protests of the officers, forced their way into the building. They were followed by others until those in the building numbered approximately 200. They remained there until about four p. m. when they were induced to leave through the efforts of the mayor and a representative of the governor who was sent to the scene of the trouble.

The main questions in the case are: Do the facts reasonably inferable from the evidence constitute "riot" within the meaning of 2 Mason Minn. St. 1927, § 10280, and, if so, is the evidence sufficient to sustain a finding that defendant participated therein? Other minor questions are raised. They require and will receive only passing attention.

■ 2 Mason Minn. St. 1927, § 10280, defines "riot." It provides:

"Whenever three or more persons, having assembled for any purpose, shall disturb the public peace by using force or violence to any other person or to property, or shall threaten or attempt to commit such disturbance, or to do an unlawful act by the use of force or violence, accompanied with the power of immediate execution of such threat or attempt, they shall be guilty of a riot."

The essential elements of the crime as defined by the statute are: (a) An assemblage of three or more persons for any purpose; (b) use of force or violence against property or persons, or, in the alternative, an attempt or threat to use force or violence or to do any other unlawful act coupled with the power of immediate execution; and (c) a resulting disturbance of the public peace.

The public peace means that tranquillity enjoyed by a community when good order reigns amongst its members. Town of Neola v. Reichart, 131 Iowa, 492, 494, 109 N. W. 5; City of Corvallis v. Carlile, 10 Or. 139, 142, 45 Am. R. 134; State v. Benedict, 11 Vt. 236, 239, 34 Am. D. 688.

In a prosecution for riot common purpose can be inferred from the circumstances and the acts committed. State v. Mizis, 48 Or. 165, 85 P. 611, 86 P. 361; Walker v. State, 17 Ga. App. 525, 87 S. E. 711.

A person may be convicted for riot even though not actively engaged therein when such person was present and ready to give support, if necessary. Commonwealth v. Frishman, 235 Mass. 449, 126 N. E. 838, 9 A. L. R. 549; Bolin v. State, 193 Ind. 302, 139 N. E. 659; State v. Straw, 33 Me. 554; Green v. State, 109 Ga. 536, 35 S. E. 97.

Examination of the record reveals ample evidence to prove all of the essential elements of the crime of riot. A crowd commencing with 40 or 50 people and increasing to about 200 congregated in front of the Montgomery Ward & Company store and later forcibly entered the building. What occurred is described by some of the witnesses for the state. Sheriff Syck testified:

Q. "Go on and tell us, if you will, please, what took place from that time on.

A. "Well, as time went on the crowd got larger in front of the store, and in the doorway, and about two o'clock they started to come in the store, a large crowd of men.

Q. "Tell us how it looked to you now as they started coming in.

A. "Well, there was about 40 or 50, I should judge, 50 or such a matter came in first when I called to them to stop.

Q. "What did you tell them, Mr. Syck?

A. "I told them they had been violating the law; that there had been damage done in the store Saturday, and they were not to come in.

Q. "Was there any remarks from the crowd to you?

A. "There was, yes.

Q. "Tell us what was said.

A. "They said, 'We will get out when you close the store; we want the store closed after the clerks get out.'

Q. "Anything else?

A. "Well—

Q. "Go on and tell us.

A. "Yes, there was quite a bit of conversation there. They said—I can't tell exactly word for word what they said, but someone in back was saying, 'Go on in,' and there were some in the crowd that said, 'Let's go,' and I told them they were not coming in, and threatened to throw some tear gas, and they stood there for probably ten minutes or such a matter, and I had word that the back door was blocked or locked, and I went back to telephone— I was either called to the telephone, or I telephoned at that time; that telephone was in the back part of the store, and while I was at the telephone, the crowd had edged their way into the store more, and had got pretty well down through the store then.

Q. "Tell us about this back door, what you know about that.

A. "Well, I can't tell you a great deal about it except it was locked from the outside. I couldn't say who locked it. There was one police officer upstairs, and there was what they called a fire door. I believe he was up there and had that door open. That was the only exit from the rear of the store.

Q. "Was that rear door, was that unlocked too?

A. "Well, it was on the start, yes.

Q. "Was it unlocked later while the crowd was there?

A. "It was unlocked but who unlocked it, I don't know.

Q. "Go on and tell us what occurred after the crowd got in there, after you completed the telephone call. Point out on the plat about where the crowd was when you finished your telephone call.

A. "They were pretty well all through this part of the store here. As a matter of fact, I was talking to you, I guess that was who I called that time, and I tried to have them leave the store then, and they kept coming through the different aisles until they were back down near this stairway going to the balcony. Of course, the store was pretty well filled then."

Clair Murphy, an employe of the store and a witness of the state, described the situation in the following language:

A. "Well, just prior to the crowd coming in, there was a large group of men kept gathering outside, kept getting larger and larger, and kept pressing more and more up into the vestibule of the store, shutting out the possibilities of anyone getting through there except this crowd, and there was a policeman stationed there who kept the women and children from going inside, and allowed these men to pack their way in there, allowing no women and children in there at all, and they kept ganging up and ganging up, and here, as far as I could see, was nothing but men, and they seemed to be waiting for someone, or something; they didn't start right in at once; they waited until they got a whole gang of them out there, and then they all started pressing in, and they started coming in on this side, and on this side, going down up to here, and as they started to come through, the sheriff called to them, and told them to stay out, and they stopped momentarily but pretty soon they started edging their way in again, and came down this aisle here next to this basement staircase on each side, and when the sheriff told them again to get out, he said, 'Men, you know that every one of you are breaking the law when you come in here, and I tell you to stay out,' and several of them answered, 'We know it,' and they kept coming at that time; there was a policeman stationed here, the gentleman that testified on the stand a moment ago, Mr. Smith was stationed in front of this work shoe counter, with a tear gas bomb in his hand; the sheriff stood right here with a tear gas bomb in his hand, and I stood right here, and there was another policeman right here with a tear gas bomb in his hand, and they kept coming, and he would threaten to throw the bomb, and they would edge forward. There was evidently a code or something—he seemed to be listening and getting ready to throw, and the policemen would draw their bombs back, and they would stop momentarily, and they would start edging forward again, and when the crowd was down about here, the sheriff was called to the phone, and he went back to the back, and the policemen stood here, and they kept dropping back just as the sheriff—they didn't threaten to throw it—they just stood there with the tear gas bomb, and when the sheriff came back again they were moving way in the back, kept

going back and back farther and farther, and when they got way to the back here, I would say right back in here, they kept coming and coming, and the sheriff asked them to leave again, told them to leave, and various remarks were made by the crowd that they wouldn't. He said, 'I have handled tougher mobs than you are and if you don't get out I will still throw this bomb,' and one of the men who was right in the lead spoke up and says, 'You do, and we will get you.' "

Other witnesses testified to the same effect. Some of them told how the participants threatened the sheriff, ordered the clerks out of the store, insisted that the place be closed, pushed back the merchandise and sat on the counters, and how one of the intruders dropped a large firecracker or other explosive of some kind. There was testimony that shoes, dresses, and coats were slashed; glass in the counters broken; grease and shoe polish put on merchandise; and other damage to the total extent of approximately $650 inflicted.

In Guyer v. Smullen, 160 Minn. 114, 199 N. W. 465, a civil action, the court characterized actions somewhat similar to those herein described as a violation of the provisions of the riot statute, G. S. 1913, § 8793. In that case the court said [160 Minn. 119]:

"Defendant was not alone. He was accompanied by a number of friends, obviously engaged in a mission of belligerence against plaintiff. It was a 'forcible trespass' against plaintiff. * * * It was a riot and, as such, a crime. Sections 8793, 8794, G. S. 1913. They were 'banging around.' They tried plaintiff's door and found it locked but did not turn away and leave plaintiff unmolested as they should have done. Violence was threatened by word and act."

The acts described by witnesses for the state constitute a violation of § 10280 to an aggravated degree. Regardless of the purpose of the original assemblage, the participants disturbed the public peace by using force and violence not only toward the officers they unlawfully resisted but also toward the property of the occupants of the building they unlawfully entered. Such conduct is in no sense a part of or incident to the right to strike, the right to picket,

or to the exercise of any other right afforded individuals attempting to improve their working conditions. All of the elements of riot were present, and each participant became a violator of the riot statute.

■ The next question to be determined is: "Was the defendant a participant?" He admits being in the crowd before entry was made. He admits looking in the door and seeing the officers in the building. He admits being in the building during a part of the time the crowd was there. He justifies his presence by the claim that he was there in the capacity of a reporter. He denies being in the group that first entered the store and claims that at the time of the forcible entrance he was in the office of the county attorney where he, in the company of others, previously had gone.

The sheriff and other witnesses testified that defendant was present when the crowd entered the store and among the first to enter, and that on one occasion while they were in the building defendant taunted the sheriff and dared him to throw a tear bomb. The issue of defendant's participation in the riotous acts was for the jury, and we have no hesitancy in saying that the evidence is sufficient to sustain the finding of the jury in that respect.

■ On direct examination the sheriff was asked to tell of the events which occurred on the Saturday before the Monday on which the invasion of the store occurred. The objection of the defendant that this question was immaterial was overruled and properly so. Defendant's counsel on cross-examination asked the sheriff to explain his presence in the store on Monday. It is clear that the occurrences on the previous Saturday occasioned the vigilance of Monday. In any event, there was no prejudice to defendant. Two employes of the company were permitted to testify as to their reason for retiring to remote parts of the store and another to testify as to his reason for taking a policeman with him when he passed through the crowd. We see no error in receiving this evidence. We have also considered the other errors raised by defendant in respect to evidentiary matters and find them to be without merit.

■ Numerous assignments of error are made by appellant respecting instructions given or omitted by the trial court. Suffice

474

it to say that the instructions given were adequate to inform the jury of the essential elements of the crime for which the defendant was being tried, and the instructions requested by defendant, insofar as they correctly stated the law, were given in substance by the court.

The order appealed from is affirmed.

