## BOLIN v. STATE OF INDIANA.

[No. 24,171.    Filed June 5, 1923.]

1. RIOT.—*Evidence.*—*Sufficiency.*—In a prosecution for riot wherein a great crowd of miners accompanied five spokesmen to the home of the mine superintendent and made numerous demands of him, the entire evidence was held amply sufficient to sustain the charge, the evidence introduced by the defendants themselves, together with the inferences properly drawn therefrom, being sufficient to sustain the verdict of guilty. p. 307.

2. RIOT.—*Evidence.*—*Tumultuous Conduct.*—When a spokesman for hundreds of miners who have visited the mine superintendent's home and overflow his yard and grounds, calling the superintendent out, asks the superintendent if he hears certain demands shouted by the crowd in the yard, it is the same as if the spokesman repeated such demands himself. · p. 307.

3. RIOT.—*Tumultuous Conduct.*—While a small committee may legally visit a citizen and a mine officer and make requests, yet when they go with hundreds of followers, shouting their demands, frightening the officer's family and driving them away, it is a violation of §2334 Burns 1914, defining riot as the doing of an act in a violent and tumultuous manner. p. 307.

4. RIOT.—*Trial.*—*Instructions.*—An instruction in a prosecution for riot which declares that if defendants assembled believing they had a grievance, such assembly would not be unlawful, is properly refused, since the essence of the offense of riot is doing an act in an unlawful manner after they are assembled. p. 310.

5. RIOT.—*Trial.*—*Instructions.*—*Evidence.*—Where all the evidence in a prosecution for riot shows that hundreds of persons gathered together to make demands of a mine superintendent, and when they were assembled in his yard, made their demands loudly and boisterously, an instruction which declares that if defendants assembled believing they had a grievance "such assembly would not be unlawful" is improper as applied to the evidence, whatever the charge might have been. p. 310.

6. RIOT.—*Trial.*—*Instructions.*—Under §2334 Burns 1914, defining riot as the doing of an act in a violent and tumultuous manner, the purpose for which persons·may have assembled is no part of the definition, and an instruction stating that persons who assemble peaceably may do acts in a violent and tumultuous manner without being criminally liable, is properly refused. p. 311.

Bolin *v.* State—193 Ind. 302.

7. RIOT.—*Indictment.—Definition.*—The allegation in an indictment for rioting under §2334 Burns 1914, that defendants "unlawfully assembled" prior to doing in an unlawful, violent and tumultuous manner the act as charged, is no part of the description of the offense charged. p. 311.

8. CRIMINAL LAW.—*Instructions.—Credibility of Witnesses.*—An instruction which tells the jury they are the sole judges of the credibility of the witnesses, and of the facts which may be considered in determining a conflict in the testimony of different witnesses, and that it would be proper to consider, among other things, all the surrounding circumstances of the witnesses as brought out in the evidence, their interest, if any, in the result of the action, and such other facts appearing from the evidence as will aid in determining whom to believe, is a proper instruction. p. 311.

9. RIOT. — *Responsibility of Participators. — Instructions.* — Instructions which declare that mere presence where a riot occurs does not make one guilty of· the offense of rioting, but that if a person so present encourages, incites, promotes, supports, countenances or takes part in a riot he is guilty of the offense, correctly state the law. p. 311.

10. CRIMINAL LAW.—*Principals in Misdemeanors.*—All who participate in the commission of a misdemeanor are guilty as principals. p. 311.

11. CRIMINAL LAW.—*Instructions.—Request.*—Where an instruction correctly states the law as far as it goes, appellant cannot complain if he has not asked for instructions supplying any omissions. p. 312.

12. WITNESSES.—*Cross-Examination.*—Objections to questions on cross-examination of a witness are properly sustained, where the questions are outside the scope of the examination in chief. p. 312.

13. WITNESSES.—*Examination.—Discretion of Court.*—The extent of cross-examination of witnesses is within the sound legal discretion of the court. p. 312.

14. WITNESSES.—*Examination.—Leading Questions.*—A witness for the defense in a prosecution for rioting, after testifying that he had heard all that was said by the members of the committee visiting the mine superintendent, and what they said, was asked further if a question containing 37 words had not been asked and answered in that way; *held* such question was leading and objectionable. p. 313.

From Gibson Circuit Court; *Robert C. Baltzell,* Judge.

Prosecution by the State of Indiana against Frank

Bolin and others for rioting.   From a judgment of conviction, the defendants appeal.   *Affirmed.*

*Frank Ely, Claude A. Smith, James P. Duncan* and *Thomas Duncan,* for appellants.

*U. S. Lesh,* Attorney-General, and *Mrs. Edward Franklin White,* Deputy Attorney-General, for the State.

EWBANK, J.—Appellants were convicted of the offense defined by §2334 Burns 1914 (Acts 1905 p. 584, §438), which in part reads as follows: "If three or more persons shall do an act in a violent and tumultuous manner, they shall be deemed guilty of a riot," etc.

The first count of the indictment, on which alone they were found guilty, charged that they and others therein named, to the number of sixty, on, etc., at, etc., "did then and there unlawfully, riotously, violently and tumultuously and with force and arms, assemble and gather themselves together in the nighttime, at and near the home of Walter E. Cox, in the town of Francisco, and did * * * in an unlawful, riotous, tumultuous and violent manner order the said Walter E. Cox to leave his home at once, and did * * * in an unlawful, riotous, tumultuous and violent manner drive him * * * from his home, contrary," etc. The only error assigned is overruling the motion of appellants for a new trial, by which they have challenged: (a) the refusal of the trial court to give certain instructions; (b) the giving of certain other instructions; (c) the refusal to permit witnesses to answer certain questions; and (d) the alleged insufficiency of the evidence to sustain the verdict.

We shall consider the last specification first.   Witnesses called on behalf of the defendants (appellants) testified to the following facts:  That Walter E. Cox was the superintendent of a mine at Francisco and lived

in a house on the mining company's property, which faced the rock road, about 125 feet back from it, a quarter of a mile north of the Baptist church in the village of Francisco, being 300 feet north of the railroad; that before nine o'clock on a dark night in June, 1922, a crowd of men estimated by defendant's first witness at 700, and by others at 300 to 500 or more, gathered in the village; that men in the crowd had come there in automobiles from Princeton, Petersburg, Oakland City, Fort Branch and Clark's Station, and were recognized by witnesses, but residents of Francisco who testified said they saw them but did not know any of them; that the automobiles filled the streets, and some of them were left a quarter of a mile or more outside the town, parked at the side of the road; that women living in Francisco were frightened by the presence of the crowd and what it did; that when the crowd was starting to move out appellant Bolin said to a mine boss then on his way to Cox's house that, "Us guys that worked in France are not going to have Hunkies take our jobs;" that two of the defendants stopped the car in which the mine boss thus spoken to and another mine boss were driving with some ladies toward Cox's house, and said they wanted to meet Cox and have him get rid of the Hunkies and armed guards, and for said bosses to go home and not go down to his house, and then those two defendants followed with the crowd down to Cox's house; that at about nine o'clock the crowd moved north along the rock road from the Baptist church corner to said house; that five men were on the porch with guns, and a man on the porch "hollered, 'What do you want?'" that appellant Bolin answered that they "wanted to meet Cox and have him get rid of his Hunkies and armed guards;" that the man on the porch "hollered, 'Send up your leader, send up a committee,'"

and that appellants Bruck, Bolin and Devine, and two other men from the crowd went toward the porch with their hands held above their heads, one of them saying they were coming up unarmed, and not to shoot; that when they got within ten or twelve feet of the porch, one of the mine bosses on the porch said "Stop, you have come far enough;" that some others of the crowd advanced into the yard to within thirty feet of the house, filling the yard that far forward; that Bruck acted as spokesman and asked Cox if he was going to discharge the "Hunkies and armed guards;" Cox answered that they were union men and he would not, and the committee reported back to the crowd, when the crowd said, "Tell him and the Hunkies and the armed. guards they can all go;" and also said to "make them all go," and to "run them all out," and that "they all had got to go," and some in the crowd yelled, "Make him go and the bosses, too," and ten or fifteen or maybe fifty voices from the crowd said to "tell him that he and the Hunkies and gunmen must all go;" that when Bruck went back to the crowd they were "hollering around," and Bruck told them to quit, "to be still and not make so much noise;" that Bruck returned to Cox and asked if he heard what they said, and then there was loud talking at the porch; that the noise made by the crowd at Cox's house was heard over in Francisco, 800 feet away; that Cox's wife then asked the crowd if they had no respect for a woman and her baby, and then Cox said he would go; that Cox asked whether he should go armed, and Bruck told him "it would be best not to take his gun out there" into the crowd; that Cox and his wife and baby then left the house and backed his car out of the garage and drove away in it, and the mine bosses and others who had been with him on the porch drove away in another automobile.

This evidence given by the witnesses for the defend-

ants, with the inferences which legitimately might be drawn from it, would be sufficient by itself to **1-3.** sustain the verdict finding the participants guilty of riot, as charged in the indictment. Clearly it is sufficient to support an inference that they "did an act in a violent and tumultuous manner."' When Bruck, assuming the office of spokesman for hundreds of men who had overflowed Cox's yard and the highway leading to it, after voices in the crowd had shouted their demands that the bosses as well as the workmen should all go, asked Cox if he heard what they said, it was the same as if he had repeated in words the demands to which he thus referred. And whatever right a committee of five might have had to visit Mr. Cox and present a request, they violated the law when they came with hundreds of followers, shouting a demand, by which they frightened his wife and drove him away.

But the verdict does not rest alone upon the evidence given by witnesses for the defense. The state also called witnesses who testified to the following **1.** additional facts, which the witnesses for the defense said they did not hear nor see: That defendant Bruck was armed with a gun when he drove from Princeton to Francisco that evening, and at the suggestion of one of the five men who rode over in his car, another of those men borrowed a revolver at a poolroom where the car was stopped for that purpose, which he carried in the crowd that went to Cox's house; that as the crowd came from the village toward his house noises were heard as if the men were tearing off fence pickets and breaking up boards and fence rails, and beating on wires; that they stopped two men in the highway not far from Cox's house and searched one of them, but said he was not the fellow they were after; that near the railroad they met an automobile in the

road, and using a profane epithet and a vile name "hollered to put out your lights or we will shoot them out," and stopped the car; that a shot or two were fired from the crowd when it was stopped; that two ladies in the car were frightened; that as the two mine bosses drove north toward Cox's house defendants Bolin and Gayer told them they were "after the Hunkies, and for them (the mine bosses) not to go down there," and as they drove up along the rock road defendant Hinkle fired a gun, caught hold of the running board of their automobile and looked in, and men in the crowd came toward it with pistols and clubs, and one struck the car with a club; but the car having stopped and the dimmers being turned on, and a man having looked in with a flash light, after about two minutes the car drove ahead; that the men in the crowd spoke in a loud, threatening manner; that as they came toward Cox's house the men in the crowd were "half running," and were saying forward, march, steady now, charge, halt, and were giving commands; that defendant Stapleton had a gun; that several persons were carrying clubs; that a bunch of fellows with guns searched the house; that as the crowd was getting ready to come into Cox's yard a shot was fired; that the crowd came down the road and forty or fifty feet inside the yard before they stopped; that when one of the mine bosses on the porch told them to halt a voice from the crowd in the yard said, "Get ready to cut them down;" that there was much racket and yelling, and some swearing, cursing and blackguarding in the yard; that the noise was plainly heard by persons five or six squares away, "loud talking, hollering and whooping" by a "big batch" of voices; that when the committee of five came forward from the crowd, they said, "We have laid our guns down and are coming up unarmed;" that when they came up to the porch one of the mine bosses said to

take it up through the constituted authorities and Bruck
said, "To hell with the constituted authorities," they
would take it on themselves to square up such things,
and that they had three counties to clean up; that when
Bruck went back to the crowd, he told them to "cut
out their cussing;" that 25 persons in the crowd "hol-
lered to run them all out" in a "mad tone of voice;"
that while Bruck and the committee were talking to
Cox, men in the yard "were hollering, 'Charge them,
Let them have it,' and so forth," which were said pretty
loud by several persons; that in talking to Cox, Bruck
used the word "damn;" that after talking a few minutes
Bruck said to Cox that he would give him and the
Hunkies five minutes to get out of town; that the com-
mittee finally told the bosses they would also have to
leave; that Mrs. Cox sat on the floor behind her bed
in a back room frightened and crying, until she came
out on the porch and asked if they had no respect for a
woman and her baby; that when she came out Bruck
told the crowd to "cut out their swearing;" that the
crowd "were hollering, 'don't be all night, make him
get out of there;' " that one of the mine bosses, in prom-
ising to leave, said it was no use for one man to fight
500, and a man in the crowd said, "There are 1,000 of
us;" that Cox finally said he could not stay and fight a
crowd like that, and that he would leave for the sake
of his wife and baby; that sending up some of the men
of Francisco to talk with Cox and the mine bosses was
suggested, but voices from the crowd said not to do
so or they would all be in jail; that the committee
of five told Cox he could not take his gun with him,
and he left it in the house; that as Cox backed his car
out of his garage men in the crowd "hollered to put out
your lights;" that as he drove through the crowd he
saw guns or clubs in the hands of the men; that Cox
wanted to turn north, but the crowd seized hold of his

car and turned it south, saying he could not go north; that as he was leaving one of the men under indictment who was in the crowd "yelled 'Go back to Ziegler, you s—— of a b——,'" and several in the crowd as he drove through it applied the same epithet to him; that he was once superintendent of a mine at Ziegler, Illinois; that as the mine bosses drove out in their car some of the crowd surrounded it and said to turn out the lights or they would shoot them out, and not to turn them on; that men came to their car and began to swear and told the mine bosses "to leave and never come back, you s——s of b——s," and there was quite a bit of swearing and blackguarding as they started to leave. And counsel for the defendants brought out in the cross-examination of Cox that two or three days before this occurred it had been rumored in Francisco that they were going to run him out of town. There was evidence connecting each of the appellants with what was done at that time. The evidence is sufficient to sustain the verdict.

The constitutional right of persons in this state of "assembling together, in a peaceable manner, to consult for their common good" (Art. 1, §31, Constitution) was sufficiently declared by the sixth instruction given. No error was committed by refusing instruction No. 2, requested by the defendants, which would also have told the jury, if it had been given, that if the defendants assembled believing they had a grievance, "such assembly would not be unlawful." The essence of the offense charged was doing an act in an unlawful manner after they were assembled. And the expression quoted does not state the law correctly as applied to the evidence recited above, whatever the charge might have been.

Neither is it the law, as defendants' instruction No. 3 would have declared, had it been given, that persons

who assemble peaceably may do acts "in a violent
6. and tumultuous manner" after they have assembled, without being criminally liable. The purpose for which persons who "do an act in a violent and tumultuous manner" may have assembled is no part of the definition of the crime of riot under the statute. §2334 Burns 1914, Acts 1905 p. 584, §438; *Kiphart* v. *State* (1873), 42 Ind. 273, 275; Elliott, Evidence §3126.

The allegation in the first count of the indictment that the defendants "unlawfully assembled" prior to
doing in an unlawful, violent and tumultuous
7. manner the act as charged, was no part of the description of the alleged offense. *Kiphart* v. *State, supra.* Appellants' requested instructions to the contrary were properly refused. The authorities cited by counsel from other jurisdictions where the definition of riot embraces an unlawful assembling together as an essential element of the offense are not in point.

Instruction No. 11, given by the court, correctly told the jury that they were the sole judges of the credibility of the witnesses, and of the facts which might
8. be considered in determining whom to believe if there should be a conflict in the testimony given by different witnesses, and stated that it would be proper to consider, among other things, "all the surrounding circumstances of the witness as brought out in the evidence, their interest, if any, in the result of the action, and such other facts appearing from the evidence as will, in your opinion, aid you in determining whom you will believe." There was nothing in this instruction which could have prejudiced the appellants.

The several instructions of which appellants complain to the effect that mere presence where a riot occurs does
not make one guilty of the offense, but that if a
9, 10. person so present encourages, incites, promotes, supports, countenances or takes part in the riot

he is guilty of the offense of riot, correctly declared the law. All who participate in the commission of a misdemeanor are guilty as principals. *Topper* v. *State* (1889), 118 Ind. 110, 111, 20 N. E. 699; *Stratton* v. *State* (1874), 45 Ind. 468, 475; *Lay* v. *State* (1895), 12 Ind. App. 362, 370, 371, 39 N. E. 768; *Merrill* v. *State* (1911), 175 Ind. 139, 146, 93 N. E. 857, 44 L. R. A. (N. S.) 439.

Instruction No. 18 given by the court did not withdraw the evidence of good character from consideration by the jury when fixing the punishment, nor tell 11. them that such evidence could only be considered for the purpose of determining the question of guilt or innocence, as was done by instructions condemned by the opinions in cases on which appellants rely. If it was not as full and complete as it should be, the defendants should have asked instructions supplying the omissions, which they did not do. It correctly states the law as far as it goes, and appellants have no cause to complain. *Corn* v. *State* (1912), 177 Ind. 158, 97 N. E. 421; *Bartlow* v. *State* (1915), 183 Ind. 398, 401, 402, 109 N. E. 201.

Appellants complain that objections were sustained to certain questions asked on cross-examination of witnesses called by the state, but do not point out 12, 13. anything in the examination in chief of those witnesses which made the excluded questions pertinent or proper. Nothing being shown to the contrary we must presume that the objections were properly sustained for the reason that the questions were outside the scope of the examination in chief, and therefore were not proper cross-examination, if for no better reason. The extent of the cross-examination permitted is within the sound legal discretion of the trial court, and no abuse of discretion is shown in this case. *Eacock* v. *State* (1907), 169 Ind. 488, 501, 82 N. E. 1039;

*Crawfordsville Trust Co.* v. *Ramsey* (1912), 178 Ind.
258, 280, 98 N. E. 177.

After Dale Stapleton, a witness for the defense, had
testified that he heard all that was said by the five
members of the committee who represented the
crowd in their conversation with Cox and others
at the porch, and had stated what each said at
that time, and had testified that he had detailed all that
was said by either of them, counsel for the defendants,
as a further part of his examination in chief recited a
supposed question and answer, of thirty-seven words
in all, and asked the witness if he heard one of the mine
bosses and Bruck, respectively, ask and answer that
question in that way, to which an objection that it was
leading was sustained.  There was no error in this.

The judgment is affirmed.