## No. 15,724.

### Trujillo et al. *v*. The People.
(178 P. [2d] 942)

Decided March 31, 1947.

Mr. Romilly Foote, for plaintiffs in error.

Mr. H. Lawrence Hinkley, Attorney General, Mr. Duke W. Dunbar, Deputy, Mr. James S. Henderson, Assistant, for the people.

*En Banc.*

*Mr. Justice Bakke delivered the opinion of the court.

Plaintiffs in error, who were defendants below and herein so designated, were found "guilty of a riot" under the provisions of section 196, chapter 48, '35 C.S.A. Three other defendants were included in the information, but as to them the trial court, on motion of the district attorney, entered a nolle prosequi as to one, another pleaded guilty and the third was convicted, but prosecutes no writ of error. In response to a joint request of the parties we have elected to decide the cause on the application for supersedeas.

The record discloses that on the evening of September 22, 1945, the Knights of Columbus, a fraternal organization, sponsored a dance held at St. Mary's Hall in the City of Walsenburg and that there were about two hundred people in attendance. In this assembly were several young men from Pueblo against whom there existed a strained relationship on the part of some young Spanish-Americans in Walsenburg, who apparently felt that the Pueblo youths were there to disrupt the dance. One of the Pueblo boys was Charles Mora, Jr., who, while the dance was in progress, was accused by defendant

---

*January 14, 1947, Mr. Justice Bakke retired from the court and Mr. Chief Justice Knous, formerly dissenting, also retired and was succeeded as chief justice by Mr. Justice Burke. Justices Hays and Alter came to the court on January 14, 1947, and participated in the final decision hereof, and on March 31, 1947, the original opinion by Mr. Justice Bakke was adhered to. Mr. Justice Luxford, not formerly participating, now participates.

Joe N. Martinez of beating his brother on a previous occasion. Mora denied this, whereupon Martinez hit him and a conflict ensued, in which Mora was set upon and badly beaten by a number of other persons. One Tom Trujillo, a deputy sheriff, being present, took Mora to the rest room to wash the blood from his face, ordered the disturbers out of the hall, and at the time struck Martinez on the head with his revolver. After Mora came from the washroom, was leaving the building, and while going down the steps, he again was attacked and beaten by members of a crowd of about twenty-five persons. Deputy Sheriff Trujillo recognized the defendant Silvano Trujillo as one of the group who was "swinging" on Mora.

At about the same time Arthur Benine, mayor pro tem of Walsenburg, his brother James Benine, and their respective wives, came out of the dance hall. Arthur made a plea to the crowd to disperse, but he and his brother were immediately seized and brutally beaten while several persons yelled, "Kill him, kill him." By this time most of the people had come out of the dance hall and concertedly they were able to disperse the group, and drove the alleged rioters toward the center of the town.

The trial court limited the evidence to the events that took place at St. Mary's Hall and excluded all of the testimony relating to what occurred after the crowd went downtown, except as to defendant Vigil, whose contention was that he had struck no one that night, and the court permitted a Mrs. Kralich to testify on rebuttal that he had struck her downtown, and also concerning the extent of her injuries.

Neither of the Benines was able to identify any of their assailants, except that each of them saw defendant Martinez manhandling another man in trying to pull him out of a car.

The statute involved reads as follows: "If two or more persons actually do an unlawful act with force or violence against the person or property of another, with

or without a common cause of quarrel, or even do a lawful act in a violent or tumultuous manner, the persons so offending shall be deemed guilty of a riot, and on conviction shall severally be fined not exceeding two hundred dollars or imprisoned in the county jail not exceeding six months." '35 C.S.A., c. 48, §196. The information, omitting the formal parts, is as follows: "That Silvano Trujillo, Claudio Casias, Modesto Vigil, Archie Roybal, and Ernest Martinez, Joe N. Martinez * * * did unlawfully, riotously, and with force and violence do an unlawful act against the person of one Arthur Benine, James Benine, and Albina Kralich, to-wit, did then and there unlawfully assault, beat, bruise and wound the said Arthur Benine, James Benine, and Albina Kralich, contrary to the form of the statute * * *"

While there are sixteen assignments of error, they are argued under the following: 1. Improper rebuttal evidence was admitted. 2. Insufficiency of the evidence to sustain the verdict. 3. Error in giving instructions.

■ 1. As already noted, the trial court limited the testimony to the disturbance that took place at St. Mary's Hall, and it undoubtedly was for that reason that the district attorney refrained from putting Albina Kralich on the witness stand to testify in the people's case in chief, notwithstanding the fact that she was one of the victims named in the information and endorsed thereon as one of the people's witnesses. Notwithstanding this situation, she was permitted to testify on rebuttal that she was struck by defendant Vigil "down in front of Sam's place." Defense counsel properly assign this as error, because the court's exclusion of any evidence as to what took place elsewhere than at St. Mary's made Mrs. Kralich's testimony on rebuttal immaterial. Vigil had testified that he struck no one that night, and the district attorney sought to impeach him, by showing with Mrs. Kralich's testimony that he struck her downtown after the riot at St. Mary's Hall was over. "It is fundamental that the impeachment of a witness must be

upon a matter material to the issue on trial." *King v. People,* 64 Colo. 398, 172 Pac. 8. That Mrs. Kralich's testimony was prejudicial to defendant Vigil appears from the fact that she told the jury that, as a result of the blow, her nose was broken and several teeth were damaged to the extent of requiring extraction. The effect of this testimony on the jury is obvious, and we think its admission reversible error as to the defendant Vigil.

2. As to the sufficiency of the evidence generally to sustain the verdict, aside from the situation as it pertained to defendant Vigil, there can be no serious question. We note that counsel for defendants, as well as one of the defendants, refers to what happened that night as a riot, and that is what it was in the ordinary acceptation of that term. 46 Am. Jur., p. 126, §2; 54 C. J., p. 828, §1. Disrupting a dance was held to be a riot in the case of *Trittipo v. State,* 13 Ind. 360. However, we are not concerned with these authorities if defendants, other than Vigil, were guilty under our statute. They took the witness stand, admitted they were present at the riot, their defense being that if they struck anyone they did so in self-defense. That issue was for the jury, and the evidence in the case sustains the verdict. 54 C. J., p. 839, §33, and cases therein cited. See, also, Wharton's Criminal Law (12th ed.), vol. 2, p. 2195.

3. Concerning the instructions, counsel's first complaint is that the trial court refused to give defendants' tendered instruction No. 1, which was based upon the theory that before there could be a riot there had to be concert of action. This same point is involved in another contention which he here urges for the first time, and that is, that the information does not charge the crime of riot under our statute. In support of this contention, he says: "The old method of charging riot in Colorado, as found in an ancient book of forms, was as follows: Riot (Mills Sec. 1310). That "A" and "B" on &c at &c, then and there being together then and there

actually, routously, riotously and with force and violence did an unlawful act against the person of one "C" (by then and there making an unlawful assault on the person of the said "C" and then and there unlawfully beating and wounding him the said "C") contrary &c." He relies on this statement to show there must be concert of action. We do find a section, "1310. Riot, what constitutes—penalty," in Mills Annotated Statutes 1891, volume 1, page 927, but we do not find any language, such as that quoted above, under that section. If the quotation is from "an ancient book of forms" other than the "Mills" to which counsel refer, it obviously is of no assistance to us. However, be that as it may, in so far as we are advised, or have been able to ascertain, this case is one of first impression under our statute, and, assuming the correctness of the above quotation, we would have to disagree with it and counsel's argument based thereon, because our statute reads, "with or without a common cause," and the law is, "it (concert of action) is not in general essential to the offense, and a previous agreement or conspiracy need not be shown." 54 C. J., p. 832, §8. A complete answer to counsel's argument on this point will be found in *Dougherty v. People,* 4 Scam. (Ill.) 179, the statute of Illinois being identical with ours.

 Counsel next argues that in giving the instruction on self-defense, No. 4, the court erred in inserting therein the words, "and not participating in any riot." The instruction reads as follows: "The court instructs the jury, that, if it finds and believes, from the evidence introduced in the cause, that any defendant herein was unjustifiably attacked by another or by others, at the place of said alleged riot, and while engaged in the lawful pursuit of his own business *and not participating in any riot,* and/or, while the same was in progress, that said defendant had a lawful right to defend himself from such attacker, or attackers; and in so doing to use such force or means as were necessary, or would seem neces-

sary, in the judgment of a reasonable man under like circumstances; and if he did so defend himself, said defendant would not be guilty of riot." While we have disapproved of the phrase "and/or," we have not held its use fatal. *Equitable Life Assurance Society v. Hemenover,* 100 Colo. 231, 67 P. (2d) 80. Counsel says that the insertion of the words we have italicized destroys self-defense as a defense. This is not necessarily true, and we think the instruction is not different in substance from those given on self-defense where excessive force is used. Newell's Sackett's Instructions to Juries (2d ed.), p. 528, §9. No cases are cited on this proposition, and the nearest authority in point that we are able to find would indicate that the instruction was favorable to defendant. In a New York riot case where the defendants attempted to show justification, the court said: "If the crime of riot was committed, there could be no such thing as justification for it." *People v. Brown,* 193. App. Div. 203.

■ Instruction No. 5 reads as follows: "The Court instructs the jury that it is not necessary for the prosecution to prove that the defendants herein, or any of them, actually beat any of the people named in the information, if the jury finds and believes from the evidence that these defendants or any two or more of them, are guilty, beyond a reasonable doubt, of rioting, as charged in the information herein, and as defined herein." Again no authority is cited holding that such an instruction is erroneous. In view of our pronouncement concerning all rioters being principals, and the proof here being positive and direct that several persons were assaulted and beaten, and that each of the defendants, aside from Vigil, here appearing was present and did strike others, we think the instruction proper. The case nearest in point on this phase of the case that we have found is that of *Bolin v. State,* 193 Ind. 302, 139 N. E. 659, where, although the instructions are not set forth, they apparently were of the same import, and the court,

expressing that they correctly declared the law, added: "All who participate in the commission of a misdemeanor are guilty as principals" (citing cases). In another case where the instructions were not specifically discussed but in which counsel's theory was involved, it was held that where a murder was committed during a riot, and defendant was a participant in the riot, it was not necessary to allege or prove that he struck the fatal blow, the court saying: "All who are present concurring in a murder are principals therein, and the death, and the act which caused it, is, in law, the act of each and of all. There is no distinction in the regard of the law, in the degrees of their guilt, or the measure of their punishment, or the nature of their offense, founded upon the nearness or remoteness of their personal agency respectively. An indictment charging it was the act of a particular individual of the party will be well sustained by evidence that any other of them gave the fatal stroke, or that it was given by some one of them, though it does not appear by which (citing authorities)." *State v. Jenkins,* 14 Rich. (S. C. Law Reports) 215, 94 Am. Dec. 132. In the authority last cited (94 Am. Dec. 132) the reported opinion is followed by a helpful annotation in which is cited a` Massachusetts case, *Commonwealth v. Campbell,* 7 Allen (Mass.) 541; 83 Am. Dec. 705, another riot case, wherein Mr. Chief Justice Bigelow, speaking for the court, said: "The jury will accordingly be instructed that, unless they are satisfied beyond a reasonable doubt that the deceased was killed by means of a gun or other deadly weapon in the hands of the prisoner, *or of one of the rioters with whom he was associated and acting,* he is entitled to an acquittal." (Italics are ours.)

In 49 A.L.R., beginning at page 1135, is an annotation containing a review of about fifty cases on "What constitutes riot within criminal law."

Having found prejudicial error in the conduct of the

trial as to defendant Vigil, the judgment is reversed as to him; otherwise it is affirmed.

MR. JUSTICE ALTER and MR. JUSTICE HILLIARD dissent.

MR. JUSTICE STONE not participating.

MR. JUSTICE HILLIARD concurring in part and dissenting in part.

I am in accord with the order of reversal of the judgment as to defendant Vigil, not only for the reasons expressed in the court's opinion, but for additional reasons, presently to be stated, which should, I think, work reversal also as to the two remaining defendants. While I do not pause to discuss all the reasons that prompt this dissent, a few points are emphasized, and I venture to present some general observations which I believe have merit.

The charge is, that defendants, "did unlawfully, riotously, and with force and violence do an unlawful act against the person of one Arthur Benine, James Benine, and Albina Kralich, to wit, did then and there unlawfully assault, beat, bruise, and wound the said Arthur Benine, James Benine, and Albina Kralich, contrary," etc. The statute of the prosecution's reliance is section 196, chapter 48, '35 C.S.A., which reads: "If two or more persons shall actually do an unlawful act with force or violence against the person or property of another, with or without a common cause of quarrel, or even do a lawful act in a violent or tumultuous manner, the persons so offending shall be deemed guilty of a riot, and on conviction shall severally be fined not exceeding two hundred dollars or imprisoned in the county jail not exceeding six months." The section quoted is substantially section 103, of an act passed in 1861 (Territorial Laws, '61, page 311), having to do with "Offenses against the Public Peace and Tranquility." The word "riot" imports an unlawful act or deed at the hands of an assemblage

of persons, usually "three or more," Webster's Dictionary; (46 Am. Jur., p. 130, §9), but by our statute, "two or more." If there is not an assemblage, there can be no riot; but the assemblage, in the first instance, need not be an unlawful one. An assemblage, originally lawful, may degenerate into an unlawful one, and the participants therein, if guilty of acts, which, if done by those assembled for that purpose, would constitute an offense, likewise will offend.

The weakness of the charge here, as I am persuaded, is, that, assemblage, assembling, or assembly, lawful or unlawful, is not alleged. "Though, in law," says Mr. Bishop, "people lawfully together may commit riot, still the assemblage must first become unlawful; that is, the riotous purpose must be entertained. Hence the unlawfulness of the assemblage must in some way appear in allegation," followed with allegations of specific law infractions, after the manner, say, of what is alleged here. 3 Bishop's New Criminal Procedure (2d ed.), page 1861, §995. The prosecutor must "allege an unlawful assembling together." *Commonwealth v. Gibney*, 2 Allen (Mass.) 150. Noticing the absence of such allegations in that case, the Massachusetts court added: "If the case was a proper one for an indictment for a riot, as it probably was, that offence not being properly charged, the indictment is bad." "Riot requires concerted action in furtherance of some common purpose, inasmuch as the absence of this element constitutes the offense either a rout or an unlawful assembly," not of riot. 46 Am. Jur., p. 131, §12. So here. There were several two-men fights, but there was no evidence that the physical encounters were in "furtherance of any common purpose." It follows, as seems clear, that defendants' motion "that the case be taken away from the jury," should have been granted.

Instruction number four, challenged because of the inclusion therein of certain language, which, for convenience of reference, I shall italicize, reads as follows:

"The court instructs the jury, that, if it finds and believes, from the evidence introduced in the cause, that any defendant herein was unjustifiably attacked by another or by others, at the place of said alleged riot, and while engaged in the lawful pursuit of his own business *and not participating in any riot, and/or, while the same was in progress,* that said defendant had a lawful right to defend himself from such attacker, or attackers; and in so doing to use such force or means as were necessary, or would seem necessary, in the judgment of a reasonable man under like circumstances; and if he did so defend himself, said defendant would not be guilty of riot." The instruction as given, minus the emphasized words, conforms to defendants' requested instruction number one, which was refused. In connection therewith, as pertinently may be reemphasized, there was no allegation of assemblage. That there were numerous individual encounters, clearly appears. But only in a single instance, and that applied but to one of the defendants, was there evidence that they were engaged in physical altercations, and that, as is not disputed, was between him and only one other. The circumstances considered, the italicized words of the instruction operated to foreclose and make inoperative defendants' defense, namely, that they were being assaulted by others, and only in self-defense did they have part in the unseemly happenings, and in each instance were acting as individuals, not in concert, against those attacking them. As counsel for defendants contends, the instruction, qualified by the questioned language, would be similar to a case where, defendant being charged with murder or assault, and self-defense was urged, the court should charge the jury, that, if they should believe from the evidence that defendant was "unlawfully attacked by another, while engaged in lawful pursuit of his own business, *and not engaged in murder or assault,"* then he should be acquitted, etc. In this connection, it is pertinent to mention, that, while the information charges these particular

defendants with having assaulted, beaten and bruised those named in the information, neither those individuals nor other witnesses identified defendants, or any of them, as their alleged assailants. In short, as I conceive, the evidence for the prosecution not only wholly failed—which should have been adjudged, as moved by defendants—but their defense, which they were entitled to have considered by the jury, was, to all intents and purposes, made nugatory by the inclusion of the criticized language in the instruction under discussion.

The whole trouble had inception in a physical encounter between one of the individual defendants and one other person, who was not a prosecuting witness nor identified in the information as allegedly assaulted. The mentioned altercation attracted attention, and the curious gathered about the scene. There were divided sympathies, as the record abundantly shows, some, called "Spanish-Americans," apparently believing that defendant Trujillo, a much decorated overseas veteran, still in uniform, was in the right, while those of "other descents," or "White-Americans," to quote from the record, thought his antagonist should be favored. Evidently, there was loud talking and not a little misbehaviour on the part of many on both sides. But the physical encounters, as I understand the record, invariably were individual. On the whole record, as I respectfully submit, the distinguished public official who conducted the prosecution, and confining it to those on one side of the misunderstanding, as he did, might better have summoned the leaders of the two groups before him, and, proceeding uncritically, explained to them the importance of the fact that the term "American" applies to every citizen, and, regardless of ancestry, none may claim to have or enjoy special rights or consideration. In short, that before the law all citizens stand on terms of equality, and that excellence is best exemplified by refrenation from comparisons based on accident of ancestry. What we are, not whence came our forebears, is

the sole criterion. In any event, the record considered, I do not think defendants belong in jail, as was adjudged, nor, were those of the other group involved, had they been prosecuted, deserving of incarceration. I would reverse the judgment generally, and conclude with the suggestion that those responsible for the prosecution seek dismissal of the case.

Mr. Justice Alter concurs in this dissenting opinion.