36173. FOWLER *v.* THE STATE.

DECIDED MAY 15, 1956.

*Hugh D. Wright*, for plaintiff in error.
*W. J. Forehand, Solicitor-General*, contra.

TOWNSEND, J. Only the general grounds of the motion for a new trial need be passed upon. From the very lengthy statement of the defendant, it appears that he had a number of children attending the local public school, and as the result of a number of fancied grievances concerning the instructors' treatment of himself and his children—most of which involved his unwillingness to pay for meals, workbooks, and other special services for which fees are generally charged to the parents of children participating therein—that he had been a thorn in the side of the duly constituted authorities for some time past, and that, "because of his much speaking," the teachers and principal of the local school had reason to infer that his presence on the premises was not likely to be the result of any gesture of friendship and co-operation on his part. On September 1, 1955, a day on which pupils and teachers were assembled for the purpose of registering, being assigned to classrooms, and drawing up plans

for the curriculum for the school term about to commence, and on which a number of parents were also present assisting their children in the registration, the defendant stationed himself in the hallway and passed out a remarkable document in the form of a newspaper entitled "P.A.T. NEWS" by E. L. Fowler, Editor, containing letters signed "E. L. Fowler, Committee," and news reports of E. L. Fowler's statements "flaying corrupt officials" under headlines reading "Unlawful Practices in Public Schools Exposed," and "Let's Not Give More Money For Them to Waste." The evidence shows that while on the school premises the defendant did the following: (a) stood in the hall and handed this paper to passers-by who would take it from him; (b) went up to two teachers engaged in a conference on school matters and interrupted it to hand them a paper, and (c) handed a paper to another teacher who was engaged in filling out registration cards for children. The paper contained statements such as the following: "We have some wonderful teachers that are half paid, but they are caught up in this sameness where a teacher with the same amount of training and education gets the same pay, regardless of how sexy, sorry and lewd they may be." The defendant did no other overt act. How long he remained on the premises is not shown.

Testimony to the effect that, after the teachers, or some of them, had received copies of this paper, they "naturally" read it, and that as a result they were much excited and distrubed; that some of them ceased their activities to go and talk to others about it, and others as a result of feeling disturbed and excited made errors in the registration slips they were filling out, must be disregarded in deciding the only legal question presented by this appeal—that is, whether the evidence supports the verdict. While the matter reported was doubtless as inaccurate as it is ungrammatical, whether or not the teachers read it, and how it affected them thereafter, was a voluntary act on their part and no coercion was brought on them by the defendant either to make them accept the paper or to read it after it had been accepted. If the criticisms leveled at the faculty were scurrilous or libelous, those involved had a remedy, and whether they chose to read the matter and be disturbed by it while the school was in session or at some other time and place, is immaterial, since this part of the

evidence deals not with an act of the defendant but the reaction of those criticized. Public servants are not insulated against criticism, either just or unjust, and if the criticism gets into the field of libel, the public servant, like any other citizen, may seek redress, but his very position as a public servant involves the risk inherent in his office of being criticized for his acts. It cannot be otherwise in a free country. The Sedition Act of 1798, enforcement of which destroyed the early Federalist Party in this country, established this fact. This act, making it unlawful to publish any scandalous and malicious writing against certain public officials, resulted in the conviction of one Matthew Lyon for writing, among other things, that "while good men were turned away for independency of sentiment, mean men got places," and stating that President Adams revealed "an unbounded thirst for ridiculous pomp, foolish adulation, and selfish avarice." Since that time, our governments, state and national, have taken the general attitude that, because criticism is unwarranted or even humiliating, it is not, simply because directed toward a public official, a criminal offense.

Examination of the cases concerning a violation of Code § 26-6913, supra, reveal that in each the words "wilfully interrupt or disturb any public school" were interpreted as referring to conduct of such disorderly nature that it in itself constituted a disturbance, rather than conduct which, while not boisterous or disturbing in itself, led others to be disturbed following a further voluntary act of their own. In *Huffman v. State,* 95 *Ga.* 469 (20 S. E. 216), the defendant was accused of "cursing and quarreling and fighting and discharging a loaded pistol and by boisterous conduct and by otherwise indecently acting." In *Board of Education of Cartersville v. Purse,* 101 *Ga.* 422, 434 (28 S. E. 896, 41 L. R. A. 593, 65 Am. St. R. 312), the parent entered a classroom and by insulting the teacher in front of the pupils broke up the class. The defendant in *Henderson v. State,* 24 *Ga. App.* 702 (101 S. E. 916), also used rough and boisterous language and physically assaulted some of those present. The defendant here did nothing but hand out printed matter to those who wished to accept it. What the printed matter contained, and what those who took it did with it is not a part of the act, but only a result of it in the minds of others. Had he handed out tickets for the

movies, or copies of the Communist Manifesto, the result would be the same so far as bringing the defendant within the purview of this particular Code section is concerned. We construe the words "wilfully interrupt or disturb" to mean a disturbance and interruption of those present which is great enough to have that effect without voluntary co-operation on the part of others. Had the teachers not read the paper at that time and place, they would not have been disturbed at that time and place. It took a co-operative action on the part of the teachers in addition to the mere act of the defendant of offering the paper in order to create the disturbance, and this is not such a disturbance as is contemplated by this Code section.

It should be added that, there being no demurrer and no Constitutional question raised, the "Jehovah's Witnesses" and similar cases bearing on freedom of speech have no place in this opinion.

The trial court erred in denying the motion for a new trial on the general grounds. The special grounds need not be passed on, as they are unlikely to recur.

*Judgment reversed. Gardner, P. J., and Carlisle, J., concur.*