# STATE v. WILLIAM MILLER AND LYLE MILLER.

## 91 N. W. (2d) 138.

### July 3, 1958—Nos. 37,399, 37,400, 37,401.

*William E. Crowder,* for appellants.

*Miles Lord,* Attorney General, *Charles A. Sawyer,* City Attorney, and *Leo P. McHale,* Assistant City Attorney, for respondent.

KNUTSON, JUSTICE.

This is a consolidated appeal from judgments of conviction of Lyle Miller and William Miller of having violated a city ordinance of the city of Minneapolis prohibiting disorderly conduct and from a conviction of William Miller for assault and battery under the state statute.

Viewed in the light most favorable to the verdicts, the evidence supports findings that during the late evening of July 21, 1957, several carloads of teen-age boys and girls were being driven past the home of Mr. and Mrs. Ralph T. Turnbull, who lived at 3044 Emerson Avenue South in Minneapolis, shouting and hollering that they were going to get Paul Turnbull. Paul was at home sleeping at the time. Upon being awakened by the shouting of these young people, Mrs. Turnbull woke Paul, and he succeeded in leaving the house and going away in his automobile. Later, some of these boys came onto the porch of the Turnbull home through some windows on the porch and demanded that Paul be turned over to them. They told Mr. and Mrs. Turnbull that they were going to get Paul. Several of the boys and girls were milling around a church which was located catercorner from the Turnbull home. At about 12:30 a. m. the police received a call that groups of teen-agers were running through yards and were driving back and forth, in the area of the Turnbull home, shouting and hollering. They appeared on the scene shortly after having received this call and observed young people near the church. They saw four boys hiding behind some bushes.

They also saw one of the boys throw something into some bushes and, upon investigation, found a stiletto and a tool handle. They picked up a boy by the name of Rudman, who is not involved in this appeal, and found a sheath in his back pocket which fit the stiletto they had found in the bushes. When the police arrived, Lyle Miller and some of the others ran and were later picked up while walking on the sidewalk in the vicinity of the church and were questioned. Lyle and some of the others were thereafter taken to the police station where they were questioned further.

Later that same evening two boys and a girl called at the Turnbull home. One of the boys forced open the latched door on the porch and entered it, demanding of the Turnbulls that he be given a right to search the house for Paul. While the Turnbulls could not identify William Miller as the boy who entered the porch until the time of the trial, evidence which will be discussed later would justify an inference that it was he who forced open the door. About 1:15 a. m., after this second visit, the Turnbulls called the police. When the squad car arrived on the scene, they found William Miller and two other boys and a girl walking on the sidewalk in that area. They asked the young people to come to the police car. Three of them did so peaceably, but William kept on walking. One of the officers walked after him and touched him on the elbow or on some part of his arm, whereupon William swung around and hit the officer with the back of his hand. In the attempt to take William to the police car, a scuffle occurred. He was subdued, and he entered the front seat of the car with an officer seated on each side of him. When the officer sitting in the driver's seat started the car, William again became violent, kicked open the front door, and pushed or kicked the officer sitting to his right out of the car; they tumbled out together. Another scuffle ensued between William and the two officers. One of them radioed for help, and another automobile with two more officers appeared on the scene. William was finally subdued, with the aid of blackjacks, and he was placed in the second car that had answered the call for help and taken to the police station.

Charges were preferred against Lyle and William under the municipal ordinance for disorderly conduct and against William for assault and battery against the police officers.

The appeal raises only questions as to whether the evidence sustains these convictions. Inasmuch as a different rule respecting burden of proof applies to a conviction under the municipal ordinance and the charge of assault and battery under the state statute, the sufficiency of the evidence to sustain these respective convictions will be considered separately.

■ The ordinance under which these defendants were charged with disorderly conduct (Minneapolis City Charter and Ordinances [Perm. ed.] 37:9-1) reads as follows:

"An ordinance relative to misdemeanors, breaches of the peace and disorderly conduct.

"Section 1. Any person who shall hereafter be found lurking, lying in wait or concealed in any house or other building, or in any yard, premises or street, within the limits of the City of Minneapolis, with intent to do any mischief, or to pilfer, or to commit any crime or misdemeanor whatever; * * * shall, upon conviction thereof, be punished by a fine of not exceeding one hundred dollars ($100.00), or by imprisonment not exceeding ninety (90) days."

It is the contention of Lyle Miller that there is no evidence to sustain a finding that he was lurking, lying in wait, or concealed in any house or building, yard, premises, or street, with intent to do any mischief or to commit any crime. Under this ordinance, it is sufficient if the defendant is found in any yard, premises, or street with intent to do any mischief or to commit the crime or misdemeanor. It is not necessary that he be found lurking, lying in wait, or concealed before he can be found guilty of a violation of the ordinance. While the complaint does charge defendants with disorderly conduct in that they were found lurking and lying in wait on that certain yard and premises commonly known and described as 3044 Emerson Avenue South in the city of Minneapolis, Minnesota, it also charges that they were found in the streets and premises adjacent to and close by those premises with intent to commit a crime. While there may not be any evidence that defendants were lurking, lying in wait, or concealed in any house or building, the evidence is sufficient if it sustains a finding that they were found in the streets and premises adjacent to and close by the described premises,

which constituted the home of the Turnbulls, under such circumstances as to constitute disorderly conduct.

The term "disorderly conduct" has been legally defined as conduct of such a nature as will affect the peace and quiet of persons who may witness it and who may be disturbed or driven to resentment by it.[1]

■ It is axiomatic that, in a prosecution for violation of a municipal ordinance, each of the elements of the offense charged must be proved by the degree of proof required.

■ We have frequently held that a violation of a city ordinance need only be established by a fair preponderance of the evidence.[2]

■ We are also governed by the rule that the findings of the court in an action tried without a jury are entitled to the same weight as the verdict of a jury[3] and will not be reversed on appeal unless the findings are manifestly against the evidence.

■ Briefly stated, it is Lyle's claim that on the evening of July 20, after visiting some cafes in the area of St. Louis Park, where he met some of his acquaintances, he went to the Hopkins Fair and stayed there until about 11 p. m. and that he then returned to Mertz's Cafe, where he met one Jack Rudman, who later was charged with a violation of the same ordinance. While at this cafe, one Don Turner told Lyle that he was going to a named location to have a fight with Paul Turnbull because of some previous difficulties. Lyle claims that he decided to go down to watch the fight; that he and some other boys went to the vicinity of the Turnbull residence for the purpose of watching this fight; that they parked their cars and walked to the vicinity of the church catercorner from the Turnbull residence; and that they were there when the squad car appeared. He testified that, when someone announced that the police were arriving, he and the others ran and were later picked up. It is his claim that he had no intention of engaging in any disturb-

[1]State v. Zanker, 179 Minn. 355, 229 N. W. 311; State v. Perry, 196 Minn. 481, 265 N. W. 302; State v. Cooper, 205 Minn. 333, 285 N. W. 903, 122 A. L. R. 727; State v. Reynolds, 243 Minn. 196, 66 N. W. (2d) 886; State v. Korich, 219 Minn. 268, 17 N. W. (2d) 497.

[2]State v. Jamieson, 211 Minn. 262, 300 N. W. 809; State v. McCabe, 251 Minn. 212, 87 N. W. (2d) 360.

[3]State v. McCabe, 251 Minn. 212, 87 N. W. (2d) 360.

ance but that he was in the area solely for the purpose of watching Turner and Turnbull fight.

When taken to the police station, Lyle was questioned by Detective Richard Short, who testified as follows:

"* * * I * * * asked Lyle Miller * * * 'Were you out to the Turnbull residence?' He said, 'Yes, I did go out there,' and I asked him if he went on the front porch and he said, 'Yes, I did.'

　　　　　*　*　*　*　*

"* * * I asked Lyle Miller if he went to the Turnbull residence. He said, 'Yes.' I said, 'For what purpose?' He said, 'To settle a score with Turnbull,' that Turnbull had committed out in Richfield previous to that night. I said, 'Was there a number of young men with you?' He said, 'Yes, there was two cars of us or more.' I asked him if he was going to a rumble and he said, 'Yes, that is what we were going to.'

"Q.　What is a rumble?

"A.　Well, we used to call them gang fights but they have decided to call it 'rumble' now."

That Lyle was in the vicinity where witnesses testified this disturbance occurred can hardly be denied, nor does he attempt to do so. If the testimony of Detective Short is accepted, together with other evidence, particularly the fact that when the police officers arrived Lyle ran from the scene, it is sufficient to establish guilt by a fair preponderance of the evidence.

William Miller claims that he had been at a union meeting until about 10:30; that when he returned to his home, where he and Lyle lived with their parents in St. Louis Park, he found that Lyle's car was gone; and that, fearing for Lyle's safety, he went in search of him. He said that he had heard that there was going to be a fight on Thirty-first and Hennepin and that one of the boys had a gun. He found Lyle's car with some boys in it and inquired about Lyle's whereabouts, and he was told that he was in the area. William claims that he then went in search of his brother. He testified that he went to the Turnbull residence looking for his brother, together with one other boy and a girl. He admits that he entered the porch but denies that he broke open the door. He said that he was told that Lyle was not there so they left. He

denies causing any disturbance at the Turnbull home.

Mr. and Mrs. Turnbull, on the other hand, testified that, after the first occurrence and after the police had picked up some of the young people near the church and had left, two boys and a girl called at their home; that one of the boys broke open the door on the porch by forcing it with his shoulder and entered and, in loud and profane terms, demanded the right to search the house for Paul; and that after this group had left the Turnbull home they called the police. It is undisputed that at about 1:15 a. m. the police station did receive the second call, this time from the Turnbulls. The police, in answer to this call, returned to the area and found William walking down the sidewalk with three other young people. They asked this group to accompany them to the police car. What transpired thereafter will be discussed in connection with the charge of assault and battery.

While there is no direct evidence that William was lurking and lying in wait with intent to commit a crime in violation of the city ordinance, there is ample evidence, if the testimony of Mr. and Mrs. Turnbull is accepted, to sustain a finding that he was part of the gang who sought Paul Turnbull for the purpose of doing violence to him. Under these circumstances, the burden of proving guilt by a fair preponderance of the evidence has been sufficiently met to justify a finding that he was guilty of a violation of this city ordinance.

Here, intent to commit a crime is expressly made a part of the charge under the complaint. It follows that the state must establish intent as an essential part of the offense charged. If the testimony of Detective Short is accepted as true, the intent of Lyle to take part in the assault upon Paul Turnbull is established by his own admission. As far as William is concerned, such intent is established by the testimony of Mr. and Mrs. Turnbull.

■ With respect to the conviction of William Miller of the crime of assault and battery, this charge is based upon a state statute, M. S. A. 619.39. Therefore, it was incumbent upon the state to prove the essential elements of the crime beyond a reasonable doubt.

■ The principal contention of William Miller is that the attempted

arrest was unlawful;[4] therefore that he had a right to resist the arrest.[5] We need not determine whether the attempt to arrest this defendant was lawful or unlawful. Even though an arrest is unlawful, a fact question usually exists as to whether a person used more force than was necessary in order to resist the arrest.

"* * * The right of a person to use force in resisting an illegal arrest is not unlimited. Unnecessary force may not be resorted to or means of resistance adopted which are disproportionate to the effort made to take him into custody; if such unlawful resistance culminates in a homicide, the party seeking to avoid arrest is guilty of manslaughter, and possibly of murder." 4 Am. Jur., Arrest, § 92.[6]

Officer Howard Fuehrer testified that, in seeking to subdue Miller after he had kicked open the door to the car, he (Fuehrer) was kicked in the head and chest and suffered other injuries. As a result, he suffered some pulled ligaments in his chest and a swelling behind his ear and other injuries which kept him from reporting for work for some time. Officer Ward L. Canfield testified that he was kicked in the face and, as a result, suffered cuts for which he was treated at General Hospital and had five stitches taken to close a cut over his right eye. There is other evidence of the use of force from which the court could find that Miller did use more force than was necessary in attempting to resist an arrest, even though the attempted arrest was unlawful. When a person resisting unlawful arrest uses more force than is necessary he becomes an aggressor and may be held guilty of an

---

[4]As to the right to arrest without a warrant, see State ex rel. Olson v. Leindecker, 91 Minn. 277, 97 N. W. 972; State v. Pluth, 157 Minn. 145, 195 N. W. 789.

[5]See, for instance, State v. Cantieny, 34 Minn. 1, 24 N. W. 458; 2 Dunnell, Dig. (3 ed.) § 516.

[6]Brown v. United States, 159 U. S. 100, 16 S. Ct. 29, 40 L. ed. 90; Bad Elk v. United States, 177 U. S. 529, 20 S. Ct. 729, 44 L. ed. 874; Davis v. State, 53 Okl. Cr. 411, 12 P. (2d) 555; Robsion v. State, 53 Okl. Cr. 178, 9 P. (2d) 54; People v. Gilman, 47 Cal. App. 118, 190 P. 205; State v. Calhoun, 23 N. Mex. 681, 170 P. 750; Porter v. State, 124 Ga. 297, 52 S. E. 283, 2 L.R.A. (N.S.) 730; Clinton v. Commonwealth, 161 Va. 1084, 172 S. E. 272.

120

assault and battery. The evidence in this case presents a fact question as to whether an assault and battery actually was committed. The court's finding in that regard is sustained by the evidence.

Affirmed.