CITY OF ST. PAUL v. ROBERT MORRIS.*

104 N. W. (2d) 902.

July 22, 1960—No. 37,909.

*Otis H. Godfrey, Sr.,* for appellant.

*Louis P. Sheahan,* Corporation Counsel, and *Robert E. Faricy,* Assistant Corporation Counsel, for respondent.

DELL, CHIEF JUSTICE.

Defendant was convicted of disorderly conduct under St. Paul City Ordinance 438.02.[1] He appeals from the judgment of conviction.

On January 10, 1959, at approximately 1:30 a. m., the defendant's half brother, Booker T. Parker, was arrested with two others on a charge of consuming liquor in a restaurant not licensed for such consumption. As the officers left the establishment and were leading the

---

* Certiorari denied, 365 U. S. 815, 81 S. Ct. 696, — L. ed. (2d) —.

[1]Ordinance 438.02 provides: "Any person or persons who shall make, aid or countenance, or assist in making any noise, riot, disturbance or improper diversion, to the annoyance or disturbance of the citizens, or other person or persons in said city; or who collect in bodies or crowds in any street or public place in said city, so as to obstruct public travel thereon, shall be guilty of a misdemeanor."

accused to the police car, the defendant walked behind them asking the officers why they were arresting his brother who, defendant claimed, had done nothing to warrant arrest. The defendant then said to the officers two or three times, "You white mother f—kers, what are you picking on us for, why don't you pick on the white people?" He was then placed under arrest. While it appears from the record that other persons were close enough to hear what was said, no claim is made that persons other than the officers did, in fact, hear the defendant's remarks or that, apart from the words referred to, the defendant created any disturbance.

Defendant contends that the use of abusive language toward a police officer does not, in itself, constitute disorderly conduct. In support of his argument he cites numerous authorities, particularly New York cases, holding that since an officer is charged with preserving the peace, offensive language directed solely toward an officer, however abusive or vile it may be, cannot be said to tend to provoke a breach of the peace. This largely fictional reasoning has been vigorously repudiated in other jurisdictions,[2] and not always followed in New York.[3]

Regardless of the merits of these cases they are of little significance since the conduct prohibited by the ordinance here involved is not limited to acts which tend to breach the peace or cause actual disturbance. It is the rule in this state, as it is generally elsewhere, that legislation relating to disorderly conduct also embraces acts which corrupt the public morals or outrage the sense of public decency.[4] Under the circumstances before us the foul, vulgar, and obscene expressions admittedly used by the defendant constituted conduct of such a nature. While it is obvious that not every abusive epithet directed

[2]See Pavish v. Meyers, 129 Wash. 605, 225 P. 633, 34 A. L. R. 561, and the authorities cited therein.

[3]Compare People v. Lukowsky, 94 Misc. 500, 159 N. Y. S. 599, relied upon by the defendant, with People v. Fenton, 102 Misc. 43, 168 N. Y. S. 725.

[4]State v. Reynolds, 243 Minn. 196, 66 N. W. (2d) 886; 2 Wharton, Criminal Law and Procedure, § 805.

toward police officers would be sufficiently disturbing or provocative to justify arrest for disorderly conduct, there is no sound reason why officers must be subjected to indignities such as present here, indignities that go far beyond what any other citizen might reasonably be expected to endure.

Since this opinion was written a dissent has appeared even though the only issue briefed and argued is the one disposed of by the majority opinion. Ordinance 438.02 is the only one involved. The trial and conviction in the court below as well as the briefs of both parties here were based on that ordinance. No other ordinance was mentioned.

The question of whether the ordinance involved is sufficiently definitive to meet constitutional requirements was not argued by the defendant. Nevertheless it is clear from our discussion in State v. Reynolds, 243 Minn. 196, 66 N. W. (2d) 886, in which we held that the offense of "disorderly conduct," as defined in M. S. A. 615.17, was not too vague or indefinite,[5] that an ordinance of the type here involved is also sufficiently certain to meet objections on constitutional grounds.

Nor can we adopt the suggestion made in the dissenting opinion that the foul and vulgar expletive here used became offensive only because it was addressed by a colored person to a Caucasian officer and referred to the "white" race. While each case must rest upon the probable and natural consequences of the defendant's own conduct, under the particular facts involved, we have no doubt that the expression would be equally provocative and offensive to any citizen, regardless of race.

No racial issue was raised in this appeal, and as pointed out in footnote 17 of the dissent, the record does not even show that the defendant and his companions were of the colored race while the officers were of the Caucasian race. We think it would have been a great deal better, and certainly far more judicial, to have waited until a case was presented to us dealing squarely with this issue than to inject it, as was unfortunately done here, through the dissent.

The defendant's other assignments, dealing with procedural matters

---

[5]Under M. S. A. 615.17 every person who "engages in brawling or fighting" is guilty of disorderly conduct.

only, have not been briefed or argued. In any event they are without merit.

Affirmed.

LOEVINGER, JUSTICE (dissenting).

This case presents the issue whether using an obscene expletive to a policeman sustains a conviction for "disorderly conduct" under the ordinances of St. Paul. Behind this apparently simple issue lurk considerations of basic importance in the relationship of government to individual. These deserve careful examination and therefore require extended discussion.

The liberty of the individual, which is rightfully one of the proudest possessions of the American people, is largely a freedom from arbitrary action by those possessed of the power of government. This is so important a matter to our people that the very structure of the government itself was formed to secure this end. The powers of government were divided among legislative, executive, and judicial branches to insure, so far as any device could do so, against abuse, arbitrary exertion, or usurpation of power.[6]

---

[6]The idea of guarding against abuse of power by dividing the power of government into three functional branches is generally assumed to have originated with Baron de Montesquieu. In his great work, "The Spirit of Laws," first published in 1748, Montesquieu said (book 11, cc. 4 and 6):

"* * * Political liberty * * * is there only when there is no abuse of power: but constant experience shews us, that every man invested with power is apt to abuse it; he pushes on till he comes to something that limits him."

"When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner.

"Again there is no liberty, if the power of judging be not separated from the legislative and executive powers. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary controul; for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor.

"There would be an end of every thing, were the same man, or the same body, whether of the nobles or of the people to exercise those three powers,

This concept has roots deep in our legal history. In the Magna Charta signed by King John at Runnymede in 1215, it was promised that no freeman should be penalized unless "by the law of the land."[7] It is now generally agreed that these words were intended to secure the individual from the arbitrary exercise of the powers of government.[8] This specific guarantee of Magna Charta has been carried into our constitutional law in the prohibition against the deprivation of life, liberty, or property without "due process of law." These words have the same meaning as the phrase "by the law of the land" used in Magna Charta in the thirteenth century.[9] This basic requirement that government proceed by due process of law has been a part of the Bill of Rights of the Minnesota constitution since it was approved by the people in 1857.[10] The same provision has been a part of the

that of enacting laws, that of executing the public resolutions, and that of judging the crimes or differences of individuals."

It is generally conceded that the ideas of Montesquieu were the principal intellectual influence in bringing the constitutional convention to adopt the scheme of government involving this division of powers. See, e. g., James M. Beck, "The Constitution of the United States," p. 232.

A century after adoption of the constitution, James Bryce in his classic work, "The American Commonwealth," remarked (1891 ed., vol. 1, p. 299):

"All the main features of American government may be deduced from two principles. One is the sovereignty of the people, * * *.

"The second * * * is the distrust of the various organs and agents of government. The States are carefully safeguarded against aggression by the central government. So are the individual citizens. Each organ of government, the executive, the legislature, the judiciary, is made a jealous observer and restrainer of the others. Since the people, being too numerous, cannot directly manage their affairs, but must commit them to agents, they have resolved to prevent abuses by trusting each agent as little as possible, and subjecting him to the oversight of other agents, who will harass and check him if he attempts to overstep his instruction."

[7]Magna Charta, par. 39, 1 M. S. A. pp. 109, 114.

[8]Bank of Columbia v. Okely, 17 U. S. (4 Wheat.) 235, 244, 4 L. ed. 559, 561.

[9]Den v. Hoboken Land & Improvement Co. 59 U. S. (18 How.) 272, 15 L. ed. 372.

[10]Minn. Const. art. 1, § 7.

Federal Constitution since ratification of the Bill of Rights in 1791 as a standard for the Federal government,[11] and as a standard for state governments since ratification of U. S. Const. Amend. XIV in 1868.[12]

This ancient and basic concept of American government has been developed and refined over the years by numerous applications and expositions. Through these it has come to be recognized as imposing certain specific minimum requirements for governmental action. Essentially these require that all three branches of government act in their respective capacities before a penalty is imposed. The legislative branch must define the offense and stipulate the penalty by proper enactment. The executive branch must apprehend the offender, institute prosecution, and present evidence showing a violation of the legislative enactment. The judicial branch must consider the charge and the evidence impartially and reach a reasoned determination that the evidence establishes violation of the legislative enactment.

These requirements are sometimes called "technical," and they may be. Nevertheless, they are the means by which the ancient and basic guarantee against arbitrary government action inflicting a penalty or curtailing individual liberty is made effective. The courts have no more important function in our system of government than the maintenance of this principle in unimpaired vitality and the application and enforcement of the technical requirements by which this purpose is secured.

It has been repeatedly held that it is fundamental to due process of law that no person be penalized except for commission of an offense which was clearly forbidden and defined by legislative enactment. While mathematical precision is not required, the legislative definition of an offense must be specific enough to give fair notice of what is forbidden to men of common intelligence and to provide a reasonably certain guide to the lawyer defending the person charged and the judge engaged in applying the law.[13] State action failing to meet this stand-

---

[11]U. S. Const. Amend. V.

[12]U. S. Const. Amend. XIV.

[13]United States v. L. Cohen Grocery Co. 255 U. S. 81, 41 S. Ct. 298, 65 L. ed. 516, 14 A. L. R. 1045; and cases cited in two succeeding footnotes.

ard violates both the Minnesota constitution[14] and the Federal Constitution.[15]

It is generally stated that the reason for this rule is to give fair notice to all individuals as to what conduct will render them subject to penalties.[16]

However, an equally important consideration appears to be that this requirement minimizes the opportunity for arbitrary action by executive and judicial officers of government. When penalties are imposed for offenses that are vaguely defined, then the police agencies become legislators and the courts are powerless to check abuses except by arrogating legislative authority to themselves. On the other hand, when penal laws are reasonably specific and definite, then police agencies, as well as the people, have guidance to recognize illegal conduct without resorting to their own ideas of what is proper or improper, and the courts similarly have standards by which to judge.

In the instant case defendant was in a restaurant when police officers arrested several other individuals in the restaurant, including defendant's half brother, on a charge of consuming liquor in an unlicensed establishment. As the officers were leaving the restaurant the defendant walked behind them and asked why they were arresting his brother. One of the officers told defendant to shut up, whereupon defendant referred to the officers as white so-and-so's, using an obscene expletive, and said they were picking on the colored people.[17] De-

---

[14]State v. Moseng, 254 Minn. 263, 95 N. W. (2d) 6; State v. Hayes, 244 Minn. 296, 70 N. W. (2d) 110; State v. Suess, 236 Minn. 174, 52 N. W. (2d) 409; State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753.

[15]Winters v. New York, 333 U. S. 507, 68 S. Ct. 665, 92 L. ed. 840; Connally v. General Const. Co. 269 U. S. 385, 46 S. Ct. 126, 70 L. ed. 322; International Harvester Co. v. Kentucky, 234 U. S. 216, 34 S. Ct. 853, 58 L. ed. 1284; cf. concurring opinion of Mr. Justice Frankfurter in Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 72 S. Ct. 777, 96 L. ed. 1098.

[16]See cases cited in footnotes 8, 9, and 10, *supra.*

[17]The record gives several versions of defendant's remark. One arresting officer testified defendant said, "You white —— ——, what are you picking on us for, why don't you pick on the white people?" Another officer testified the defendant said, "Why are you white —— —— picking on us?" Another

fendant used a normal tone of voice, and there was no noise, fighting, violence, or threat of violence.[18] The officers then arrested defendant. He was arraigned on a "tab charge" of committing "the crime of disorderly conduct."[19] After a hearing before a municipal judge without a jury, the judge entered "a finding of guilty under the ordinance."[20] There is no further specification of the charge. It is apparently assumed by counsel trying the case and by the opinion of this court that defendant was charged with violation of St. Paul City Ordinance 438.02.

Examination of the St. Paul city ordinances discloses that there are two sections indexed to the heading "Disorderly Conduct." Ordinance 469.02 prohibits "rioting, quarreling, fighting, revelling, drunkenness, or any other disorderly conduct * * *."[21] This section, however, is

---

officer testified the defendant said, "You white —— ——, what are you doing up here bothering the colored people?" The testimony of the officers agrees with respect to the use of the term "white" and the epithet. For reasons stated in the opinion the precise character of the epithet is not considered important. Although the record does not state this explicitly, it seems reasonably obvious that the defendant and his companions were of the Negro race and the officers were of the Caucasian race.

[18]One officer testified defendant "didn't make any noise or do any fighting, other than just that word. He was very peaceful from there on, and except to say that, he was peaceful before." (Record p. 4.) Another officer was asked, "There was no rioting or fighting whatsoever other than just the mere statement of the words?" He answered, "No, there was no fighting or anything else," and to the question, "Just that word to you officers?" answered, "That is right." A third officer testified that the defendant caused "no disturbance," and "no fighting, quarreling or anything like that," and no "riot, fighting or other disturbance, or noise." (Record pp. 10, 11, and 12.) A witness for defendant testified that he used "a normal voice. I mean it wasn't shouted or loud or anything; an ordinary conversational voice." (Record p. 18.) None of this testimony was disputed.

[19]Record pp. 1 and 2.

[20]Record p. 26.

[21]St. Paul City Ordinance 469.02 reads as follows:

"Disorderly Conduct. No person or persons within the City of St. Paul, shall commit or suffer to be committed, in any house or other building or premises by him, or her, or them occupied, any rioting, quarreling, fighting,

confined to acts committed in a house or building or on premises occupied by the defendant. It appears in a chapter relating to "Disorderly Houses." Since defendant in the present case is not charged with doing any act in any house, building, or premises occupied by him, Ordinance 469.02 clearly has no application.

Ordinance 438.02 is headed "Riots." It makes it a misdemeanor to make "any noise, riot, disturbance or improper diversion * * *."[22] Ordinance 438.02 does not contain the words "disorderly conduct" or any reference to that term. There is a serious question whether the charge against the defendant was proper and whether he may be found guilty of violating Ordinance 438.02 under this charge. It has been held that "disorderly conduct" is too vague a phrase to define an offense.[23] Further, this court has held that a charge in substantially the language of Ordinance 438.02 does not charge the commission of any specific act constituting an offense, and is, therefore, insufficient to sustain a conviction.[24] However, passing this point, there are more important reasons why this conviction should not be permitted to stand.

Although defendant was charged with "the crime of disorderly conduct," he can be convicted only of violating some specific ordinance. There are no common-law crimes in this state,[25] and disorderly conduct is not a crime at common law in any event.[26] Consistently

revelling, drunkenness, or any other disorderly conduct, calculated to disturb the neighborhood, or annoy travelers or others."

[22]St. Paul City Ordinance 438.02 reads as follows:

"Riots. Any person or persons who shall make, aid or countenance, or assist in making any noise, riot, disturbance or improper diversion, to the annoyance or disturbance of the citizens, or other person or persons in said city; or who collect in bodies or crowds in any street or public place in said city, so as to obstruct public travel thereon, shall be guilty of a misdemeanor."

[23]Griffin v. Smith, 184 Ga. 871, 193 S. E. 777.

[24]State v. Swanson, 106 Minn. 288, 119 N. W. 45.

[25]State v. Cantrell, 220 Minn. 13, 18 N. W. (2d) 681; State ex rel. Thurston v. Sargent, 71 Minn. 28, 73 N. W. 626.

[26]State v. Reynolds, 243 Minn. 196, 66 N. W. (2d) 886; Lewis v. Commonwealth, 184 Va, 69, 34 S. E. (2d) 389; 27 C. J. S., Disorderly Conduct, § 1.

with constitutional due process of law, defendant can be convicted only of an offense established and defined by legislative enactment. It is, therefore, irrelevant that defendant may have been charged with "disorderly conduct." Likewise, decisions containing expansive discussions of disorderly conduct are irrelevant to this case.[27] Neither this court nor the court below is privileged to legislate by reading either the term or the concept of disorderly conduct into an ordinance which makes no reference to them.[28] Evidence as to defendant's offense must be measured by the explicit terms of the ordinance, if any, applicable to this case.

We must consider, therefore, whether the use of an obscene expletive in and of itself is an illegal "noise, riot, disturbance or improper diversion."

It is a matter of common knowledge, readily verified by reference to the dictionary, that the word "noise" refers to clamor, din, or uproar, or to sound that is objectionable by reason of its volume or discordant quality. It certainly does not apply to sound that is offensive merely because of the import of the words used or the sense conveyed. Courts that have considered the matter, including this court, have held that noise, in such a context, refers to more than audible sound, and means sound which is disturbing to others because of its volume, such as shouting upon the streets at night.[29]

---

[27]It is noteworthy that "disorderly conduct" does not mean merely offensive conduct. Commonwealth v. Lombard, 321 Mass. 294, 73 N. E. (2d) 465.

Cases on opprobrious words addressed to a policeman as breach of the peace are collected in Annotation, 34 A. L. R. 566. Cases on words as a criminal offense other than libel or slander are collected in Annotation, 48 A. L. R. 83. No case cited appears to consider the precise issue presented in this case, although Anderson v. City of Camden, 52 N. J. L. 289, 19 A. 539, holds that indecent language is not a violation of an ordinance very similar to the one involved here.

[28]Lewis v. Commonwealth, 184 Va. 69, 34 S. E. (2d) 389.

[29]State v. Cantieny, 34 Minn. 1, 24 N. W. 458; City of Bismarck v. Anderson (N. D.) 71 N. W. (2d) 457; Vaszil v. Molnar, 133 N. J. Eq. 577, 33 A. (2d) 743.

The term "riot" has a well-established and recognized legal meaning, which is a tumultuous disturbance of the peace by three or more persons acting with a common purpose in a violent and turbulent manner.[30] The statutes of this state[31] and the views of this court are consistent with this definition.[32] It is true that the term "riot" is sometimes used in current popular speech with a somewhat less technical meaning. In this sense the term "riot" may be equivalent to the colloquialism "rumble," which has been said to mean a gang fight.[33] In any event, it is clear that the term "riot" refers to an event involving more than one person and involving action of a violent character.

The term "disturbance" also has an established legal significance. As used in the law, disturbance connotes civil commotion and means conduct which interferes with or interrupts a peaceful assembly of others.[34] Although the term "disturbance" is a broad one with numerous other meanings,[35] as used in the context of an enactment having to do with noise or riot, the term is apparently a shorthand expression for the common-law offense of disturbance of public meetings.[36] It has been held that the term "disturbance" as used in a context such as that here means conduct which is itself so disorderly that it amounts to civil commotion and does not mean conduct which merely causes others to be disturbed.[37] The word "disturbance" is undoubtedly used also in

---

[30]Salem Mfg. Co. v. First American Fire Ins. Co. (9 Cir.) 111 F. (2d) 797; Walter v. Northern Ins. Co. 370 Ill. 283, 18 N. E. (2d) 906, 121 A. L. R. 244; International Wire Works v. Hanover Fire Ins. Co. 230 Wis. 72, 283 N. W. 292; 77 C. J. S., Riot, § 1.

[31]M. S. A. 615.02.

[32]State v. Winkels, 204 Minn. 466, 283 N. W. 763.

[33]State v. Miller, 253 Minn. 112, 91 N. W. (2d) 138.

[34]State v. Stuth, 11 Wash. 423, 39 P. 665; State v. Mancini, 91 Vt. 507, 101 A. 581; Fowler v. State, 93 Ga. App. 883, 93 S. E. (2d) 183.

[35]27 C. J. S., p. 815.

[36]27 C. J. S., Disturbance of Public Meetings, § 1.

[37]Fowler v. State, 93 Ga. App. 883, 93 S. E. (2d) 183. In Anderson v. City of Camden, 52 N. J. L. 289, 19 A. 539, it was held that a complaint alleging utterance of indecent words did not charge violation of an ordinance prohibiting "noise, riot, disturbance or breach of the peace."

a less technical popular sense. However, in this sense it means a brawl, tumult, or commotion which does not amount to a riot.

The word "diversion" does not appear to have any contemporary meaning relevant to this subject. The literal meaning of the term is of a turning aside. The popular meaning is of an amusement or recreation. The term may have been used in an archaic sense, now unknown, since the language of this ordinance is more than a century old.[38] The legislative history suggests that the term was either a synonym for "disturbance" or was essentially meaningless.[39] In any

---

[38]The substance of Ordinance 438.02 first appears in the St. Paul ordinances as Ordinance 4, § 2, approved June 29, 1858. It there reads as follows:

"Any person or persons who shall make, aid, countenance or assist in making any noise, riot, disturbance, or improper diversion; and all persons who shall collect in bodies or crowds in said city for unlawful purposes, to the annoyance or disturbance of the citizens or travelers, shall, for each offense, on conviction before the said City Justice be liable to the punishment and penalties provided in section one of this ordinance."

The marginal title of this section is "Breaches of the peace &c."

By Ordinance 40, approved October 7, 1869, this section was made to read as follows:

"Any person who shall make, aid or countenance, or assist in making any noise to the disturbance of the inhabitants or other persons in said city, or make, aid or encourage any riot, disturbance or improper diversion, to the annoyance or disturbance of the citizens or other person or persons in said city, and all persons who shall collect in bodies or crowds in said city, for any unlawful purpose, to the annoyance or disturbance of the citizens, or other person or persons, shall, for each offense, on conviction before the said City Justice, be fined in any sum not exceeding one hundred dollars, to which may be added, in the discretion of the City Justice, imprisonment not to exceed three months."

Ordinance 1475, approved February 18, 1891, repealed Ordinance 40, and § 2 of the new ordinance, under the marginal title "Riot, disturbance, etc.," contained the language now set forth in Ordinance 438.02.

[39]The language of the successive versions of this ordinance is set forth in footnotes 38 and 22, *supra*. Note particularly the language of the 1869 version.

Sir Frederick Pollock, in "A First Book of Jurisprudence," c. 7, p. 334, aptly noted that: "About the end of the last century the only art of the parlia-

event, the term must now be read as having a meaning similar to "noise, riot, or disturbance." This is required by the rule of ejusdem generis, which is especially applicable to the definition of criminal offenses.[40] Further, since due process requires that the legislative definition of an offense give fair notice of the conduct that is forbidden,[41] it follows that the language of the definition must be intelligible to a man of common learning. Definitions of criminal offenses cannot be couched in esoteric or archaic terms that make them traps for the ordinary man. They must give fair warning to average men as well as to antiquarians and legal scholars. Consistently with this view, it has been held that conduct which is not a noise, riot, or disturbance does not constitute an "improper diversion" even though it may be immoral and illegal.[42]

Thus, a rational analysis demonstrates that the use of expletives, without violence or threat of violence, is not within the legal, the popular, or the literal meaning of any of the terms "noise," "riot," "disturbance," or "diversion." However, the record is clear that the defendant was not guilty of any noise, riot, fighting, or disturbance other than the utterance of the objectionable expletive in a normal tone of voice.[43]

If offensive utterances that are not loud, violent, or tumultuous can be held to violate this ordinance, then anything offensive to a policeman and municipal judge is within its scope with equal logic. In that case, punishable conduct is merely that which sufficiently displeases a judge. This is purely arbitrary power, not a rule of law.

---

mentary draftsman was to pile up as many words as possible, significant and insignificant, on the chance that in their multitude the intention of the enactment might find safety."

[40]State v. End, 232 Minn. 266, 45 N. W. (2d) 378.

[41]See cases cited in footnotes 13, 14, and 15, *supra*.

[42]City of Chicago v. Murray, 333 Ill. App. 233, 77 N. E. (2d) 452. In that case defendant committed adultery in such circumstances that her husband shot and killed her partner. It was held that the adultery did not constitute an offense under an ordinance similar in all material respects to that involved here.

[43]See testimony cited in footnote 18, *supra*.

The power is arbitrary not because the judge's ideas are aberrant or at variance with community attitudes, but because the standard of legality is the judge's idea, rather than a legislative standard. Arbitrary, in this context, means fixed or done at pleasure or will, and not governed by established rules, standards, or adequate determining principles.[44] Protection of the individual against arbitrary government action is the very essence of due process.[45] The cut of such constitutional principles is not confined to great causes and prominent parties but applies with equal force to prevent the imposition of a small fine on an obscure defendant under a municipal ordinance by unreasonable extension of the terms of the ordinance.[46] Thus the instant case presents precisely the type of situation in which the application of these constitutional principles is historically appropriate and logically necessary.

Nevertheless, it is difficult to be altogether rational in responding to an emotional exclamation that is obviously intended as an affront. Those with skins of that peculiar yellowish-pink color that is called "white" in the contemporary vernacular are unused to racial denigration and insults. Thus, it comes as a severe shock to have the term "white" used in a derisive sense. When it is coupled with a derogatory and offensive expletive, the shock turns to indignation which regards this as obscene or even blasphemous. The natural inclination is to feel that if an execratory expletive is offensive enough it must be illegal regardless of "technicalities." The difficulty is that it is quite

[44]Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. ed. 220; Paul v. Board of Zoning Appeals, 142 Conn. 40, 110 A. (2d) 619; Canada Dry Ginger Ale, Inc. v. F & A Distributing Co. 28 N. J. 444, 147 A. (2d) 15; also see, Baisden v. Floyd County Board of Education, 270 Ky. 839, 110 S. W. (2d) 671; Goodrum v. State (Tex. Civ. App.) 158 S. W. (2d) 81; Eureka Bldg. & Loan Assn. v. Myers, 147 Kan. 609, 78 P. (2d) 68; Central of Georgia Ry. Co. v. Mote, 131 Ga. 166, 62 S. E. 164; In re Housing Authority, 235 N. C. 463, 70 S. E. (2d) 500; Turbeville v. Morris, 203 S. C. 287, 26 S. E. (2d) 821.

[45]Slochower v. Board of Education, 350 U. S. 551, 76 S. Ct. 637, 100 L. ed. 692.

[46]Thompson v. City of Louisville, 362 U. S. 199, 80 S. Ct. 624, 4 L. ed. (2d) 654.

impossible to determine how offensive any particular expression is. To begin with, curses, oaths, expletives, execrations, imprecations, maledictions, and the whole vocabulary of insults are not intended or susceptible of literal interpretation. They are expressions of annoyance and hostility—nothing more. To attach greater significance to them is stupid, ignorant, or naive. Their significance is emotional, and it is not merely immensurable but also variable. The emotional quality of exclamations varies from time to time, from region to region, and as between social, cultural, and ethnic groups. The standards of verbal behavior of those social groups within which judges move are not fairly applicable to the entire population.[47]

The very violence of feeling aroused by an offensive expression should warn judges of the dangers of being injudicious and of the impropriety of determining legal significance by their own reactions or feelings. The mere fact that acts or words are offensive does not mean that they are "disorderly" or within that special category of disorderly described as noise, riot, disturbance, or diversion. This has been held in cases in which the conduct complained of was apparently less offensive than here.[48] It should be noted that this principle does not prevent the legislature from passing a proper enactment forbidding the use of language that threatens a breach of the peace.[49]

---

[47]The particular expression found objectionable here and abhorrent to every member of this court, including the writer of this opinion, is reputedly not uncommon among certain social groups.

[48]State v. Korich, 219 Minn. 268, 17 N. W. (2d) 497; City of Chicago v. Murray, 333 Ill. App. 233, 77 N. E. (2d) 452; Commonwealth v. Lombard, 321 Mass. 294, 73 N. E. (2d) 465; cf. Terminiello v. Chicago, 337 U. S. 1, 69 S. Ct. 894, 93 L. ed. 1131. In this latter case speech that was in some respects more offensive, because more deliberate, than that involved in the present case, and which actually resulted in violence, was held not to constitute a violation of an ordinance substantially the same as that involved here. The decision was put upon the grounds that the speech was protected by the constitutional right of free speech. However, it should be noted that this invokes the due-process clause of U. S. Const. Amend. XIV, which, in the view expressed here, also interposes a bar to application of substantially the same ordinance to the facts in the present case.

[49]Chaplinsky v. New Hampshire, 315 U. S. 568, 62 S. Ct. 766, 86 L. ed.

These principles cannot be disregarded merely because a particular verbal expression is *very* offensive to the judiciary. Before the judiciary may impose punishment for any conduct, other than contempt of court, offenses must be defined by the legislature. It is a bald arrogation of legislative power for courts to rewrite or extend the meaning of penal enactments. Such an exercise of power is purely arbitrary since it depends entirely on the subjective inclination of the judge which is not known or knowable in advance, and which is not exercised in accordance with any established principle or rule. The imposition of a penalty in this manner is not according to due process of law or the law of the land.

Since the conduct of defendant here was not clearly encompassed within the terms of the ordinance invoked for his punishment, the conviction was contrary to Minn. Const. art. 1, § 7, and U. S. Const. Amend. XIV, was therefore invalid, and should be reversed.

---

1031. There is a statute in Minnesota substantially similar to that which was held valid in the foregoing case. M. S. A. 615.15.